IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
November 8, 2005 Session

**STATE OF TENNESSEE  v.  CHARLES RICE**

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 01-00035     Hon. Joseph B. Dailey, Judge**

————————

**No. W2002-00471-SC-DDT-DD - Filed February 22, 2006**

————————

A jury convicted the defendant, Charles Rice, of first degree murder.  Following a capital sentencing hearing, the jury found three aggravating circumstances: (1) the defendant was previously convicted of one or more felonies, the statutory elements of which involve the use of violence to the person; (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; and (3) the murder was knowingly committed by the defendant while the defendant had a substantial role in committing, or was fleeing after having a substantial role in committing or attempting to commit a  rape.  Tenn. Code Ann. § 39-13-204(i)(2), (5), (7) (1997).  The jury also found that these aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.  Accordingly, the jury imposed a sentence of death.  The Court of Criminal Appeals affirmed both the conviction and sentence.

Upon automatic appeal pursuant to Tennessee Code Annotated section 39-13-206 (2003), this Court entered an order specifying seven issues for oral argument,[1] including (1) whether the evidence is sufficient to support the conviction; (2) whether the evidence is sufficient to support the aggravating circumstances found by the jury; (3) whether the trial court's instruction to the jury that aggravated assault was a felony whose statutory elements involve violence to the person violated the Sixth and Fourteenth Amendments to the United States Constitution; (4) whether the trial court's restriction of the defendant's cross-examination regarding Tony Evans' prior conviction was harmless error; (5) whether the trial court erred in refusing to allow the defendant to sit at the defense counsel table; (6) whether the trial court erred in not instructing the jury on the lesser-included offense of facilitation; and (7) whether the death sentence is comparatively proportionate and valid under the mandatory review provisions of Tennessee Code Annotated section 39-13-206(c)(1)(A)-(D) (2003).  After a careful review of the record and relevant legal authority, we affirm the judgment of the Court of Criminal Appeals.

---

[1]  "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned.  The Court may enter an order designating those issues it wishes addressed at oral argument."  Tenn. Sup. Ct. R. 12.2.

**Tenn. Code Ann. § 39-13-206(a)(1);**
**Judgment of the Court of Criminal Appeals is Affirmed.**

WILLIAM M. BARKER, C.J., delivered the opinion of the court, in which E. RILEY ANDERSON, JANICE M. HOLDER, and CORNELIA A. CLARK, JJ., joined. ADOLPHO A. BIRCH, Jr., J., filed a concurring and dissenting opinion.

Marty B. McAfee and Stephen Leffler, Memphis, Tennessee, for the appellant, Charles Rice.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Angele M. Gregory, Assistant Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. BACKGROUND**

**A. Guilt Phase**

The victim, thirteen-year-old Emily Branch, was reported missing on June 18, 2000, and her body was discovered on June 25, 2000. After a police investigation, the defendant, Charles Rice, was questioned and arrested for her murder. A Shelby County jury found the defendant guilty of first degree premeditated murder and of first degree felony murder and sentenced the defendant to death. The convictions were subsequently merged into a single conviction.

The State's proof at trial established that on June 18, 2000, the victim was staying with her father, Steven Dwayney Branch ("Branch"). Branch lived in Memphis with his girlfriend and her three children. The victim usually lived with Branch's sister, Margaret Branch, but she was staying with her father because it was Father's Day.

The victim's mother, Tracie Anderson ("Anderson"), was married to the defendant during the time relevant to this case, but the victim never lived with her mother and the defendant while they were married. Anderson and the defendant had argued on June 6, 2000, prompting Anderson to leave the defendant and move in with her brother. She had left the defendant on numerous other occasions, but had always returned. Prior to her leaving, the defendant told her that if she left him, "[i]t will hurt you more than it hurts me." Anderson told Branch not to let the victim go to the defendant's house anymore. According to Anderson, the defendant used drugs, specifically crack cocaine.

On the morning of the 18th, the victim left her father's house at about 11:00 a.m. with three other girls. She was wearing "a white short-pants overall set with a navy blue shirt, some white socks, her blue and white tennies, and she had a necklace around her neck." Monica Downey ("Downey"), one of the daughters of Branch's girlfriend, was with the victim that day. She testified that she, the victim, and five other girls "walked around because that's our normal routine every

day." While out walking, the defendant came by and talked to the victim. Downey said that she could not hear what was said.

After the defendant left, the girls went to a store and then to the defendant's house on Firestone Street. The victim went inside the house while Downey and the other girls waited outside. The victim later came outside and told Downey that they all had to leave; they left the victim on the defendant's front porch and went to a park. According to Downey, this was about 4:00 or 5:00 in the afternoon. Downey said that it was not unusual for the victim to go to the defendant's house when the victim's mother lived there. Downey did not know that the victim's mother no longer lived there. She said that she never saw the defendant while they were at his house.

According to Willie Lee Hall ("Hall"), the defendant's stepfather who lived with the defendant at 1272 Firestone Street, the victim came by the residence on the 18th of June, asking to walk the dog. After Hall refused, the victim went outside to talk to the girls with whom she had been. Then the victim left the house with the defendant, walking down the street toward Bellevue Street. According to Hall, this was about 3:40 in the afternoon. Later that afternoon, the defendant returned to the house to watch television; he did not change his clothes. Hall said that while at the house, before leaving with the defendant, the victim was never out of his sight.

Marquette Houston ("Houston"), a friend of the victim from the neighborhood, saw the victim on the afternoon of June 18, sitting on her father's front porch listening to music. He recalled that she was listening to a Vanilla Ice CD. He told her that "nobody . . . listen[s] to Vanilla Ice [any] more." Houston noticed that the CD had a scratch on it.

Tony Evans ("Evans"), a friend of the victim's mother and father, also saw the victim on the day of her disappearance. He lived on Firestone Street, and on the afternoon of June 18, around 2:00 or 3:00 p.m., he saw the victim and a "lot of little girls" walk to the defendant's house. Later that day, he observed the victim and the defendant walking away from the defendant's house heading west on Firestone. He found it surprising that the two were together because he knew that the victim's mother had recently left the defendant due to abuse. Therefore, he followed the victim and the defendant. After turning off Firestone Street, the two went up a small street then headed back on Empire Street, and then south on Bellevue toward an Amoco station. Then they walked past the station through the pathway on the side. At that time, Evans returned home to finish his yard work. Evans explained that he stopped following the two when they got to the path by the Amoco station because the path leads to Brown Street, where some of the defendant's relatives lived. He assumed that the victim's mother and the defendant had gotten back together and that the defendant and victim were going to visit relatives.

The victim's father began to worry when the victim had not returned home by 5:00 p.m. on June 18. He called the police that night to report her missing. The police told him that she would probably be back and that they would report her as a runaway. Branch testified that the victim had never run away before, so that night he began to search the neighborhood for her. A few of his neighbors helped in his search.

The following day, Anderson called Evans and asked him if he had seen the victim. Evans told her that he had seen the victim and the defendant go down the path next to the Amoco station. After speaking with the victim's mother, Evans went to the area of the path to look for the victim, but did not find anything. He explained that he wanted to find the victim because both parents were his good friends. Several days later, Branch also spoke with Evans, telling him that the victim had been missing since June 18.

Evans testified that two days after the victim was last seen, he saw Mario Rice ("Mario"), who is the defendant's nephew, and the defendant walk together down to the woods by the Amoco station. He said that the police were called, but they did not get there in time because it was night. During the week the victim was missing, Evans saw the defendant and Mario sitting in the yard of a house on Alaska Street, watching that same pathway. This made him even more suspicious of the defendant. For two to three nights in a row, Evans hid in the crawl space underneath the house on Alaska Street where Mario and the defendant were. While there, he overheard Mario and the defendant discuss plans to kill Anderson. He never heard them talk about the victim. He remained under the house on those nights until 4:00 or 5:00 in the morning.

On June 25, Evans had repaired his four-wheeler and drove back to the area surrounding the pathway to search again. When he went into the woods, he smelled an odor like something had died, so he began looking in the direction from which the smell was coming. He had to chop through the bushes with a machete. Finally, he "stepped up on the tree and looked down, [and] saw her shoes." Evans ran from the woods to Branch's house and told him that he had found the victim's body behind the Amoco station on Chelsea Street.

Branch, Evans, and Houston went in Branch's truck to the parking lot of the Amoco station. From there, Evans led them down a trail behind the station. On the path, Houston noticed a Vanilla Ice CD on the ground that had the same scratch on it that he had seen on the CD of the victim, and it looked like it was "cracked or something." They reached the victim's body, which was lying in a ditch in a heavily wooded area. When they found the victim, her shorts and underwear were down around her ankles. Branch testified that he could not recognize his daughter's facial features because the body had decomposed, but he recognized her clothing, shoes, and necklace as the same as she had been wearing on the day she disappeared. Evans was also able to recognize the victim by her hair and clothes. After identifying the body as that of the victim, they called the police.

Sergeant Robin Hulley of the Memphis Police Department was called to the Amoco station on Chelsea Street at approximately 5:00 p.m. on June 25, 2000, on a "DOA unknown." Once he arrived at that address, he was led by a uniformed officer to the actual scene behind the store. Sergeant Hulley testified that to the right side of the store there is a pathway that opens onto a big grassy field, about the size of a football field. The victim's body was located in what appeared to be a dry creek bed in a heavily wooded area to the right of the opening. The victim was lying face up. She had on a pair of white short overalls, which were pulled completely down to around her ankles, and her underwear was also pulled down. Her shirt was still in place. Sergeant Hulley stated that the body was not visible from the path or the grassy field, although it was not covered by any

brush. The only blood found at the scene was directly around the body. While walking down the path, Sergeant Hulley noticed a broken Vanilla Ice CD, which he thought strange due to the fact that there was no other debris on the path.

Sergeant James L. Fitzpatrick of the Memphis Police Department was in charge of the crime scene on June 25, 2000. He testified that the victim's body was found in an old ditch, in advanced stages of decomposition. There was no upper torso, the legs and arms were still intact, and the head appeared to be "mummified." The victim had on short pants, which were down around below her knees.

Michael Jeffrey Clark, an officer with the Memphis Police Department, was also assigned to investigate the murder on June 25, 2000. At the scene, Officer Clark spoke briefly with Evans and Houston. He later spoke with them in depth at the homicide office, where he also interviewed Branch, Anderson, and Mario. Officer Clark then went to the defendant's home and spoke with the defendant's step-father, Hall, and the defendant's mother, Delores Hall. According to Hall's testimony, the defendant told the police that on the day of her disappearance, he and the victim parted ways at the intersection of Bellevue and Firestone.

The defendant was subsequently brought to the police station, where Officer Clark and Officer Ernestine Davison interviewed him at approximately 2:00 a.m. on the morning of June 26. Officer Clark read the defendant his Miranda rights, and the defendant signed a form indicating that he understood those rights. Clark told the defendant that other witnesses had seen him enter the woods with the victim near the Amoco station. The defendant denied going into the woods with her and denied any knowledge of her disappearance.

Clark then told the defendant that it appeared to him that the victim had been raped, and he asked the defendant if he would be willing to submit to a DNA test so that police could compare his DNA with the DNA found on the victim. At that point, the defendant admitted that he had engaged in consensual sex with the victim inside the kitchen of his parents' house on June 18, explaining: "I had sex for about a minute with her." The defendant admitted the victim asked him for money and to walk his dog. He said that he asked her to walk to the store with him so he could get some change, but when they arrived at the store, he told the victim that he did not have any money, and they parted ways.

The defendant then changed his story again, stating that he and the victim went to his house after the victim asked him for money, and this led to the sexual act in the kitchen. The defendant said that the victim then left the house alone and that he did not see her again. When Officer Clark confronted the defendant with Hall's story that he saw the defendant leave the house with the victim, the defendant replied that he entered the woods with the victim, but denied any wrongdoing.

Officers Clark and Davison decided to arrest the defendant and to place him in the Shelby County jail. While checking him in, the defendant asked to be placed in protective custody because he had received some threats from family members in the neighborhood. Officer Clark asked the

defendant: "Do you mean the family members of the girl you killed?" The defendant responded: "Yes, sir." On cross-examination, however, the officers testified that the defendant constantly maintained that he did not kill the victim.

Sergeant Fitzpatrick read the defendant's statement to the jury. In his statement, the defendant said that the last time he saw the victim was between 4:30 and 5:30 p.m. on June 18, 2000, behind the Amoco station. When asked how he and the victim came to be behind the Amoco station, the defendant replied, "Me and Emily walked down through there on the way to the field. And that's when my nephew [Mario] killed Emily Branch." The defendant explained that he and Mario planned to have the victim at that location so that Mario could kill the victim. He said that Mario wanted to kill the victim because Mario "was tired of seeing [the defendant] go through things [he] was going through with Emily's mother." The initial plan was to have Anderson, the victim's mother, accompany the defendant to the field where Mario would kill her, but they could not find Anderson.

The defendant stated that he first encountered the victim on the day of her death as she was walking between Bellevue and Smith Street with her friends. The victim wanted to walk his dog and wanted ten dollars, so the defendant told her to meet him at his stepfather's house on Firestone Street. He said that while they were at the house, they had sex in the kitchen, and "[i]t lasted about sixty seconds." He said that the victim "brushed her chest against [him] and said she knowed [sic] that her stuff was gooder [sic] than her mother's." He said that this was the first time they had sex and that he did not reach climax. After the sexual encounter with the victim, they left the house and went to the Amoco station on Chelsea Street under his guise that he would get change and give the victim the ten dollars that she requested. The defendant then told her that he did not have the money. At that time, the victim followed him into woods, where they were met by Mario. The defendant then said:

> And that's when we said, "Fuck this bitch; let's kill this bitch." I told Emily about an apple tree and a fenced-in area, so she went in there, and that's when my nephew started to stab her. He stabbed her in the head first and in the throat numerous times and in the chest area numerous times. That's when I ran, and my nephew, Mario Rice, ran behind me. We got out to the street on Brown, and I ran towards Lewis or Louisville. I don't know which one. And Mario went the other way on Brown. I went up Louisville or Lewis to a friend's house on Montgomery. Then I went to another friend's house on Ayers, and that's where Mario and I met up again. We started drinking, and we stayed together until about 10:00 p.m. And then he went home and I went home.

The defendant said that Mario used a "kitchen knife, not a butcher knife." He then provided more details about the actual murder, saying:

> She was facing him, and he was facing her, and there were a lot of words. He was talking to her. I really don't know exactly what he was saying. Then he pulled the knife from out of his left back pocket, and then he stabbed her in the head. She went

-6-

down on one or two knees, and that's when he stabbed her in the throat a bunch of times, and she fell back on her back. She was moving her hands like she was trying to tell Mario to stop. She pulled – and she had pulled her clothes down before the first stabbing, and I guess she thought she was getting ready to be raped by what Mario was saying because it made me wonder why was she taking her clothes down. As I think about it, I think she must of fell back because of the way Mario was stabbing her in the neck and chest.

The defendant said that the plan was to lure the victim's mother to the field and to "take care" of her. He said that he "was going to take care of the mother, and Mario was going to take care of anybody else." He continued, "I was probably going to jump on the mother. That probably wasn't all I would have done to her." About the victim's death, the defendant stated that he felt "sad, guilty, and responsible" because he "could have prevented it by not luring her into that field."

Sergeant Fitzpatrick took the defendant back to the crime scene on June 27 for a "walk through" video of the events leading to the victim's death. The defendant said he got the victim to accompany him to a secluded part of the field by telling her there was an apple tree back there. The defendant then led the officers directly to the spot where the body had been discovered. On cross-examination, Sergeant Fitzpatrick admitted that in every statement given by the defendant, the defendant denied actually killing the victim.

Two or three days after the police first went to Hall's house, they returned and asked to search the house. Hall granted permission. The police took a knife that was on the dining room table. Hall testified that the knife had been lying there for the "longest time."

Dr. Cynthia Gardner, a medical examiner with the Shelby County medical examiner's office, testified that she first examined the victim's body at the crime scene. She said that the body was found "lying on her back in a field" with her shorts pulled down around her ankles. The body was in a state of advanced decomposition, and "in many areas . . . the soft tissues were completely gone and only the skeleton remain[ed]." She next performed an external examination of the body with the clothing intact. She noted that decomposition was occurring at different rates in different areas of the body. She explained that "differential decomposition is associated with areas of injuries."

If there's a breach in the skin surface somewhere or even if there is a large bruise, which is just a collection of blood, both of those factors are very attractive to the infection bacteria that promote decomposition. So when you see a body where there w[ere] areas of decomposition which has [sic] occurred at a faster rate, it's more advanced decomposition in a very specific area. That indicates that there was probably injury in that area.

Dr. Garner noted advanced decomposition in the "head, the neck, the chest, the upper back, and in the groin area." She opined that because of the advanced state of decomposition in the vaginal area, there had been some sort of trauma or injury to that area prior to death. The victim had

-7-

what appeared to be stab wounds in the right lower quadrant of her torso and on the left wrist. Dr. Garner stated that the wounds to the wrist were defensive injuries. All the wounds were consistent with those inflicted by a kitchen knife.

Examination of the victim's shirt revealed multiple tears that were consistent with those produced by a knife. Ten total defects were found in the shirt: one in the right lower quadrant; four in the anterior left chest; one in the right chest; three in the arm; and one in the back. Dr. Garner observed injury to the victim's neck, indicating that a sharp instrument went all the way through the soft tissue from the skin down to the bone in the back. She explained that the windpipe and esophagus are located directly in this region of the neck and would "most definitely have been severed." There was another point of sharp trauma to the back of the skull where there was a puncture wound, but it did not penetrate through the skull. From her examination, Dr. Garner determined that there were ten stab wounds on the shirt, three to the neck, one to the back of the head, and two to the left wrist, for a total of sixteen stab wounds. She concluded that the cause of death was multiple stab wounds.

Due to the extent of decomposition, Dr. Garner was unable to obtain DNA from the victim's body for testing. The victim's body was identified as that of Emily Branch through comparison of dental records.

Dr. Steven Symes, a forensic anthropologist with the Shelby County medical examiner's office, also testified as to the condition of the victim's body. He examined the bones of the victim's upper body and found four instances of "sharp trauma to bone," three of which were in the neck and one in the back of the skull. The wounds in the neck were inflicted from front to back, penetrated through her neck, and impacted her spinal cord. The knife used had been a single-edged blade, like those of some kitchen knives.

In his defense, the defendant called several witnesses who provided alibis for both himself and Mario, in direct contradiction to the defendant's statement to police that he had lured the victim to the field where Mario proceeded to murder the victim.

Providing an alibi for Mario were Lee Bearden ("Bearden"), R.L. Branch, Donnie Tate ("Tate"), and Larry Rice. According to Bearden, R.L. Branch and Tate, the three men, plus Mario, were watching football and playing dominoes at Bearden's house from 1:00 p.m. until about 3:00 p.m. on June 18, 2000. Mario then left with R.L. Branch and Tate and went to the Save-A-Lot grocery store where they met Larry Rice and Carolyn Rice at about 4:00 p.m. Then they went to Tate's house for dinner. Around 8:00 p.m, R.L. Branch took Mario to meet a girlfriend. R.L. Branch also testified that Mario and the victim were cousins and that they were close.

Roy Herron provided an alibi for the defendant. He testified that at 5:00 p.m. on June 18, 2000, the defendant came to his house, where they watched the U.S. Open golf tournament until its conclusion at about 7:00 p.m. Mr. Herron said that the defendant did not have any blood on his clothes or shoes, and he did not have a weapon on him. Julie Scobey, an employee of WMC-TV in

Memphis, confirmed that on June 18, 2000, the U.S. Open golf tournament was broadcast on their station from 12:30 p.m. until 6:59 p.m.

Although he did not testify in his own defense, the defendant sought to discredit the testimony of Evans. To contradict Evans' testimony that he had hid in the crawlspace under the house in which the defendant was visiting, the defense called Michael Patton "Patton"). Patton testified that in June of 2000, he stayed at 1039 Alaska Street at least once a week, but usually two to three times a week. He testified about the hole that was located behind the house that led to the crawl space. He said that nothing was kept under there except for a ladder. The entrance to the crawl space was located at the back of the house, under the children's bedrooms. According to him, there were dogs in neighboring yards that would bark if anyone was in the backyard. He said that a person inside the house would be able to hear if someone was hiding in the crawl space. Patton was not at that house on either June 23 or 24.

Evans was convicted on October 3, 2001, of possession with intent to sell fifteen grams of crack cocaine and 2.7 grams of powdered cocaine. This was after the arrest of the defendant, but before the defendant's trial. Evans received a six-year sentence. Rosyln Johnson is a presentence investigator for Correctional Alternatives, Inc. She prepared Evans' presentence report when he was convicted. That report indicated that Evans said that he had been diagnosed as being paranoid schizophrenic. He listed his next psychiatric appointment and provided her with medicine bottles. On cross-examination, Evans denied that he had been diagnosed with paranoid schizophrenia and denied that he took medication for any mental illness. When he was shown records that he had given his corrections officer indicating that he was in fact on medication, he denied that the statements in those reports were true.

Finally, Dr. Joseph Angelillo, a clinical psychologist, testified that he had met with the defendant five times and performed a series of tests. The defendant had a full-scale IQ of seventy-nine, placing him in the eighth percentile.

Stephanie Fitch also testified for the defense. She had given a statement to the police on July 16, 2001, in which she said she saw the victim at the store around 5:00 p.m. with other girls and later saw her walking alone on the railroad tracks. She testified at trial that this prior statement was not true. She also denied signing the statement. She testified at trial that she last saw the victim on the morning of the 18th at the store with a bunch of girls.

After deliberation, the jury convicted the defendant of first degree premeditated murder and of first degree felony murder; these convictions were subsequently merged.

**SENTENCING PHASE**

During the sentencing phase of the trial, the State put on the following proof. First, Bob Fleming, a criminal court clerk, testified that the defendant pled guilty to aggravated assault on January 2, 1991.

Steven Branch testified that the victim was thirteen years old when she disappeared. She had been living with his sister, but staying with him for the summer. She wanted to be a model when she grew up, and he was saving money to send her to modeling school. He enjoyed spending time with her, and since her death, he felt "real bad." He often spends nights sitting in his living room looking at her picture.

The defendant called Gloria Shettles, a mitigation investigator, to testify about the defendant's past. One of the defendant's sisters died from lupus; another sister died from colon cancer. A brother died in a drowning accident, and his father died from cancer.

The defendant attended school in Memphis. He was held back in the third grade. In the fifth grade, he was only reading at a third-grade level and failed spelling. His conduct in the sixth grade was listed as unsatisfactory, and he was reading below a third-grade level. In seventh grade, he received all Fs except for a D in music. He received no grades in the eighth grade due to nonattendance, at which time he dropped out of school.

When the defendant was sixteen years old, he was a witness to a crime in his neighborhood and testified for the State. The transcript from that trial revealed that he had witnessed a robbery and murder at a neighborhood grocery store. The defendant later identified the perpetrators of the crime in a police line-up.

The defendant was thirty-five years old at the time of the victim's death. Joyce Rice, the defendant's sister, testified that the defendant was the youngest of six children, only three of whom are still alive. She confirmed that the defendant had witnessed a crime and believed that he saw the men being killed. She explained that one of their brothers was murdered over gambling by being hit in the back of the head and thrown into a swimming pool. She cared about the defendant, but conceded that he had been using "crack" cocaine for about two years, and as a result, his life was going downhill.

Dr. Joseph Angelillo met with the defendant several times and conducted various intellectual and personality tests. He also reviewed the defendant's school records and social history. The defendant had a "significant amount of loss in his life." The fact that he was a witness to murder was also a significant event. Other significant factors included his inability to retain a job for any length of time, his use of "crack" cocaine, marijuana and alcohol, his experimentation with LSD, and his past suicide attempt. Dr. Angelillo explained that drug use remains an important factor because of "one's erratic behavior, moods, unpredictability, change in personality, change in impulse control, and things like that with the repeated use of that particular substance."

Intellectual tests showed that the defendant's intellect "was in the upper end of what is termed the borderline range. That was the full scale IQ . . . 79." Dr. Angelillo opined that the defendant suffers from a delusional and paranoid disorder, but that these are factored with his history of drug and alcohol abuse. He has a "dependant personality . . . as well as passive - aggressive . . . personality traits." The delusional disorder "would impair [his] ability to construe, to manage to

make sense out of day-to-day situations."

Dr. Angelillo admitted that during testing, he found the defendant to be "very angry . . . somewhat sullen, mistrustful, and generally self-indulgent." A computer generated test indicated that the defendant has a disregard for authoritative figures, tends to deny responsibility, and blames others for his problems.

Corporal Barbara Williams, an employee of the Shelby County Sheriff's Department, testified that there were no incidents of violence reported involving the defendant since he had been confined at the Shelby County Jail. The defendant did attempt suicide, however, on July 5, 2000.

Following deliberation, the jury found the following aggravating circumstances: (1) the defendant was previously convicted of one or more felonies, the statutory elements of which involve the use of violence to the person; (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; and (3) the murder was knowingly committed by the defendant while the defendant had a substantial role in committing, or was fleeing after having a substantial role in committing or attempting to commit a rape. See Tenn. Code Ann. § 39-13-204(i)(2), (5), (7) (1997). The jury also found that these aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. Accordingly, the jury sentenced the defendant to death. On appeal, the Court of Criminal Appeals upheld both the verdict of guilty and the sentence of death.

## II. ANALYSIS

### A. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence, arguing that there is insufficient evidence to support the identity of the defendant as the perpetrator and insufficient evidence that the murder was committed during the perpetration of a rape. We disagree.

The standard for an appellate court when reviewing a challenge to the sufficiency of the evidence is "whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002); see also Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999). Because a verdict of guilt removes the presumption of innocence and imposes a presumption of guilt, the burden shifts to the defendant upon conviction to show why the evidence is insufficient to support the verdict. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). On appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom. State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000); see also Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599.

A verdict of guilt by the trier of fact resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not re-weigh or re-evaluate the evidence." Evans, 108 S.W.3d at 236 (citing Bland, 958 S.W.2d at 659). Nor may this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. Evans, 108 S.W.3d at 236-37.

## 1. Defendant's Identity as Perpetrator

The defendant argues that the evidence is insufficient to prove his identity as the perpetrator of the murder and rape of the victim. He asserts that he was convicted based primarily upon the testimony of Evans and upon his own statements to police. It is the defendant's contention that Evans is not a credible witness because he is a convicted felon who himself was a suspect in this crime and lied under oath. The defendant further asserts that he gave a false confession to the police, evidenced by the fact that part of the confession, that Mario murdered the victim, was proved to be false by multiple witnesses at trial. The State responds that both the direct and circumstantial proof establish the defendant as the perpetrator.

The defendant was convicted of both premeditated first degree murder and felony murder. The defendant does not appeal whether the murder was premeditated, but rather whether the evidence is sufficient to prove his identity as the murderer. The identity of the perpetrator is an essential element of any crime. See State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975). Sufficient proof of the perpetrator's identity may be established through circumstantial evidence alone. Reid, 91 S.W.3d at 277. In such cases, however, the facts must be "'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone.'" Id. (quoting State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993)). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958) (citations omitted).

In this case, the proof at trial showed that on the day of the victim's disappearance, she was last seen in the defendant's presence. The victim went to the house where the defendant lived with his step-father. After being at the house a short time, she and the defendant were seen leaving together. They were then seen walking down the pathway next to the Amoco station–the same path that led to where the victim's body was discovered one week later.

By his own admission, the defendant lured the victim into the woods by promising to show her an apple tree but did not intend for her to leave the woods alive. Once in the woods, the victim was stabbed sixteen times and left to die. When the defendant returned to the woods with the police, he was able to lead the police directly to the location where the victim's body had been found and to explain how the murder occurred. As for the defendant's contention that the testimony of Evans

was unreliable and that his own statements to the police were untruthful, it is for the jury to decide what weight to give to the evidence and to determine the credibility of witnesses. See Evans, 108 S.W.3d at 236. Based on all the evidence, clearly a rational trier of fact could have found that the defendant was the perpetrator of the crime.

Furthermore, as the Court of Criminal Appeals noted:

[E]ven were the jury to accept the facts as the Defendant presented them, that he lured the victim into the woods knowing that Mario Rice intended to kill the victim and then watched as Mario Rice killed the victim, the evidence is still sufficient to sustain the Defendant's first degree murder conviction.

Under Tennessee law, "[i]t is well established that any person who aids or abets in the commission of a criminal offense is guilty in the same degree as the principal who committed the crime." State v. Lemacks, 996 S.W.2d 166, 171 (Tenn. 1999) (citing Presley v. State, 30 S.W.2d 231, 233 (Tenn. 1930)); see also Tenn. Code Ann. § 39-11-402 (establishing criminal responsibility for a person who solicits, directs, or aids another to commit the offense). Therefore, a rational trier of fact could have found that the defendant was criminally responsible for the victim's murder even if Mario had been the one to actually stab her.

### 2. Killing During a Rape

The defendant next contends that the evidence is insufficient to prove that the killing was committed during the perpetration of a rape, so as to support his conviction for felony murder. He contends that the State's proof regarding rape is based purely on circumstantial facts, which are insufficient to support a felony murder conviction.

In order to obtain a conviction for felony murder in this case, the State was required to prove: (1) a killing of another; (2) committed during the perpetration of a rape. See Tenn. Code Ann. § 39-13-202(2) (Supp. 1998). Rape is defined as:

[U]nlawful sexual penetration of a victim by the defendant . . . accompanied by any of the following circumstances:

(1) Force or coercion is used to accomplish the act;

(2) The sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent . . . .

Tenn. Code Ann. § 39-13-503(a) (1997).

The felony murder rule applies when the killing is "done in pursuance of the unlawful act,

-13-

and not collateral to it." Farmer v. State, 296 S.W.2d 879, 883 (Tenn. 1956). "The killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent from it." Id. (quoting Wharton on Homicide, § 126 (3d ed.)). The killing "may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999).

The Court of Criminal Appeals compared two opinions from this Court in concluding that the evidence in this case was sufficient to prove that the murder took place during the commission of a rape. In the first case, State v. Ronnie Dunn, No. 03S01-9211-CR-00104, 1993 WL 339919 (Tenn. Sept. 7, 1993) (designated not for publication),[2] the Court found that the evidence of rape was insufficient because while there was evidence of sexual activity, it was "plausible to conclude" that the sexual activity was consensual between the victim and the defendant. This was due in part to evidence of an existing physical relationship between the defendant and victim, evidenced by the fact that they were seen kissing the day before the victim's disappearance. The other case which the Court of Criminal Appeals looked at was State v. Shepherd, 902 S.W.2d 895 (Tenn. 1995). In Shepherd, this Court distinguished the facts of Dunn and found that the evidence in Shepherd did support a finding that the murder had occurred during the commission of a rape. We held that it was not "just as plausible" to conclude that consensual sexual activity had occurred because the victim had struggled with the defendant and refused to have sex with him shortly before she was killed. 902 S.W.2d at 902.

In this case, the Court of Criminal Appeals found the facts to be likewise distinguishable from Dunn because "it is not 'just as plausible to conclude that the victim and the [d]efendant engaged in consensual sexual activity.'" The evidence at trial showed that the victim was found with her overalls and underwear pulled down around her ankles. The forensic pathologist testified that there was a high probability that the victim suffered bruising or injury to her vaginal area prior to death, as evinced by the rapid rate of decomposition in that region.

When confronted with the officer's belief that the victim had been raped, the defendant was asked to submit to a DNA test. At that point, the defendant changed his previous story and said that he had consensual sex with the victim, his thirteen-year-old step-daughter, on the day of her disappearance. The defendant said that he and the victim engaged in sexual intercourse in the kitchen of his stepfather's house; however, the defendant's stepfather testified that the victim was never out of his sight while at the house that day. And when questioned about the victim's clothing being found down around her ankles, the defendant responded that the victim had pulled them down herself, likely believing that she was about to be raped. A jury could have reasonably inferred that the defendant's admission to having sex with the victim was his way of explaining any DNA that

[2] Rule 4 of the Tennessee Rules of the Supreme Court states that "Unless explicitly designated 'Not For Publication,' all opinions of the Tennessee Supreme Court shall be published in the official reporter." Tenn. R. S. Ct. 4(2). "Unless designated 'Not For Citation,' 'DCRO' or 'DNP' pursuant to subsection (F) of this Rule, unpublished opinions for all other purposes shall be considered persuasive authority." Tenn. R. S. Ct. 4(H)(1).

may have been found on the victim, thereby linking the defendant to her rape. We conclude that there is more than sufficient evidence that the defendant killed the victim during the perpetration of rape. Thus the defendant is not entitled to relief on this issue.

## B. Aggravating Circumstances

### 1. (i)(5) Heinous, Atrocious, or Cruel

Tennessee Code Annotated section 39-13-204(i) provides that "[n]o death penalty or sentence of imprisonment for life without possibility of parole shall be imposed but upon a unanimous finding that the state has proven beyond a reasonable doubt the existence of one (1) or more of the statutory aggravating circumstances . . . ." The State has the burden of proving beyond a reasonable doubt that a statutory aggravating circumstance exists. Tenn. Code Ann. § 39-13-204(i). In determining whether the evidence supports the existence of an aggravating factor, "the proper inquiry for an appellate court is whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt." State v. Suttles, 30 S.W.3d 252, 262 (Tenn. 2000).

In imposing a sentence of death, the jury found that aggravating circumstance (i)(5) applied. The (i)(5) aggravating factor requires evidence that: "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5). The defendant argues that the evidence presented at trial was insufficient to justify a rational trier of fact in finding this circumstance beyond a reasonable doubt.

This Court has previously held that "torture" means "'the infliction of severe mental or physical pain upon the victim while he or she remains alive and conscious.'" State v. Reid, 164 S.W.3d 286, 315 (Tenn. 2005) (quoting State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985)); see also State v. Pike, 978 S.W.2d 904, 917 (Tenn. 1998); State v. Odom, 928 S.W.2d 18, 26 (Tenn. 1996). Similarly, with respect to "serious physical abuse beyond that necessary to produce death," we have said:

> The word "serious" alludes to a matter of degree. The abuse must be physical, as opposed to mental, and it must be "beyond that" or more than what is "necessary to produce death." "Abuse" is defined as an act that is "excessive" or which makes "improper use of a thing," or which uses a thing "in a manner contrary to the natural or legal rules for its use."

Odom, 928 S.W.2d at 26 (quoting Black's Law Dictionary 11 (6th ed. 1990)); see also Reid, 164 S.W.3d at 315. This aggravating circumstance may be applied if the evidence is sufficient to support *either* torture or serious physical abuse beyond that necessary to produce death. Suttles, 30 S.W.3d at 262; State v. Hines, 919 S.W.2d 573, 581 (Tenn. 1995).

In concluding that the proof was sufficient to support the existence of "serious physical

abuse," the Court of Criminal Appeals noted that the victim had been stabbed sixteen times and had suffered defensive wounds to her wrist. Three of the wounds, those to the neck, were each sufficient to cause death. Therefore, the Court held that the other thirteen stab wounds established "serious physical abuse beyond that necessary to produce death." We agree.

In Reid, we held that evidence of multiple stab wounds to two victims supported a finding of torture and serious physical injury beyond that necessary to produce death:

> Both victims were stabbed in the throat or neck with such severe force that the murder weapon penetrated bone; indeed, the wounds inflicted on [one victim] included five cuts to her vertebral column as a result of a "sawing" motion. Both victims were alive and conscious for five to fifteen minutes as they bled to death in great pain.

164 S.W.3d at 315; see also Suttles, 30 S.W.3d at 263 (multiple knife wounds supported serious physical abuse under (i)(5) aggravator in capital case); State v. Mann, 959 S.W.2d 503, 511-12 (Tenn. 1997) (same); but cf. Odom, 928 S.W.2d at 26 (holding that three stab wounds did not constitute torture or serious physical abuse).

While there is no proof that the victim remained conscious during the infliction of all sixteen wounds, there is ample proof that she was conscious and suffered the infliction of severe physical pain as she fought back at least during the first few blows, as evidenced by the defensive wounds to her wrists. Because aggravating circumstance (i)(5) may apply if the evidence is sufficient to support either torture or serious physical abuse, see Suttles, 30 S.W.3d at 262, it is unnecessary to find torture because the evidence is sufficient to support a finding of serious physical abuse.

### 2. (i)(7) Committed During a Rape

The jury also found that aggravating circumstance (i)(7) applied. The (i)(7) aggravating factor requires evidence that: "[t]he murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit . . . any . . . rape . . . ." Tenn. Code Ann. § 39-13-204(i)(7). The defendant asserts the same argument and grounds to argue that the evidence is insufficient to support the jury's finding of this aggravating circumstance as he asserted to contest the sufficiency of the evidence to support his felony murder conviction based upon rape. Essentially, he argues again that the evidence is insufficient to prove that he raped the victim.

Having previously concluded that the evidence was sufficient to support the jury's finding that the defendant raped the victim in the context of the felony murder conviction, and having discussed that holding in section (A)(2) of this opinion, *supra*, we conclude that the evidence is sufficient for a rational trier of fact to find that this aggravating circumstance existed beyond a reasonable doubt.

### 3. (i)(2) Prior Violent Felony

#### a. Sufficiency of the evidence of circumstance (i)(2)

Finally, the jury found that aggravating circumstance (i)(2) also applied, which requires evidence that "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person." Tenn. Code Ann. § 39-13-204(i)(2). The State presented evidence that the defendant had previously been convicted of aggravated assault on January 2, 1991. No evidence, however, was presented concerning the facts of the prior conviction, merely that there was a conviction. The trial court instructed the jury that to prove aggravating circumstance (i)(2), the State was relying on the crime of aggravated assault, "which is a felony involving the use of violence to the person."

The defendant contends that because aggravated assault is a crime that can be committed either with or without the use of violence to the person, the State was required to present evidence showing that his aggravated assault conviction involved violence against the person before the conviction could be used to support aggravating circumstance (i)(2). Because no such evidence is in the record, the defendant argues that the evidence is insufficient to support this aggravating circumstance. We agree.

In 1989, the General Assembly amended the (i)(2) aggravating circumstance to provide that a jury could consider as an aggravating factor that "the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose *statutory* elements involve the use of violence to the person." Tenn. Code Ann. § 39-13-204(i)(2) (1991) (emphasis added). In State v. Sims, 45 S.W.3d 1, 11-12 (Tenn. 2001), we held that whether the statutory elements of an offense involve the use of violence to the person must be determined by the trial court, not the jury.

In Sims, the State introduced evidence of two prior convictions for aggravated assault to establish the prior violent felony aggravating circumstance. We recognized that the statutory elements of aggravated assault do not necessarily involve the use of violence. Not only may aggravated assault be committed by actual violence, the offense may also be committed by intentionally or knowingly causing the victim to reasonably fear imminent bodily injury by use or display of a deadly weapon. Accordingly, we approved a procedure in which the trial judge, outside the presence of the jury, determines whether the elements of that offense involved the use of violence to the person. 45 S.W.3d at 11-12. If the trial court determines that the statutory elements of the prior offense involved the use of violence, the State may introduce evidence that the defendant had previously been convicted of that prior offense. Id. The trial court then would instruct the jury that the prior conviction involved the use of violence to the person. Id. This Court has since reaffirmed the procedure developed in Sims. See, e.g., State v. Cole, 155 S.W.3d 885, 901-02 (Tenn. 2005); State v. Powers, 101 S.W.3d 383, 400-01 (Tenn. 2003); State v. McKinney, 74 S.W.3d 291, 305 (Tenn. 2002).

The trial court in this case did not follow the procedures set forth in Sims. No determination

was made as to whether the elements of the prior aggravated assault involved the use of violence to the person, and no evidence was presented to the court or jury regarding the underlying facts of this offense. Accordingly, there is no proof in the record to support a finding that the defendant's prior conviction for aggravated assault involved the use of violence to the person.

The defendant, however, did not object at trial to the use of his aggravated assault conviction. Nevertheless, this Court is required under Tennessee Code Annotated section 39-13-206 to review the sufficiency of the evidence supporting the aggravating circumstances found by the jury in every capital case. We hold that because the trial court failed to conduct the requisite Sims analysis of the underlying conviction, there was insufficient evidence that the defendant had been previously convicted of a felony whose statutory elements included the use of violence against a person. Because this is an issue of sufficiency of the evidence, the defendant's inaction did not result in waiver.

### b. Trial court's instruction regarding aggravating circumstance (i)(2)

The defendant also argues that the trial court's instruction to the jury that aggravated assault is an offense whose statutory elements involve the use of violence to the person violates the Sixth and Fourteenth Amendments to the United States Constitution. Relying on the intermediate appellate court opinion in State v. Cole, No. W2002-01254-CCA-R3-DD, 2003 WL 22848969 (Tenn. Crim. App. Nov. 24, 2003), the Court of Criminal Appeals held that the aggravated assault instruction in this case violated Ring v. Arizona, 536 U.S. 584 (2002). Ring held that the Sixth and Fourteenth Amendments to the United States Constitution required that all facts underlying aggravating circumstances in capital cases be found by a jury beyond a reasonable doubt. However, this Court later reversed the intermediate appellate court in Cole and held that the procedure set forth in Sims did not violate either Apprendi v. New Jersey, 530 U.S. 466 (2000), or Ring. See State v. Cole, 155 S.W.3d 885 (Tenn. 2005).

In Apprendi, the United State Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Two years later, in Ring, the Court applied Apprendi to the Arizona capital sentencing statutes, and held that because Arizona's enumerated aggravating factors operate as "'the functional equivalent of an element of a greater offense,'" the Sixth Amendment requires that they be found by a jury, rather than by a judge. Ring, 536 U.S. at 609 (quoting Apprendi, 530 U.S. at 494 n.19). Thus, "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact–no matter how the State labels it–must be found by a jury beyond a reasonable doubt." Ring, 536 U.S. at 602.

Similarly, in Blakely v. Washington, 542 U.S. 296 (2004), the United States Supreme Court held unconstitutional a sentencing regime that allowed judges to find "factors" that increased a sentence beyond the maximum allowed by the jury findings alone. However, the Court explicitly excluded from this general rule "'the fact of a prior conviction.'" Blakely, 542 U.S. at 301 (quoting

Apprendi, 530 U.S. at 490). In Shepard v. United States, __ U.S. __, 125 S.Ct. 1254 (2005), the Court again addressed a sentencing court's ability to find the "fact of a prior conviction," affirming that the prior conviction exception remained good law, but limiting the information upon which the court could rely in making that determination. Id. at1262-63.

In Shepard, the government sought to use the Armed Career Criminal Act ("ACCA") to enhance the defendant's sentence. However, the statute under which the defendant was previously convicted did not clearly meet the requirement of the ACCA that the conviction be a "violent felony." To demonstrate compliance with the ACCA, the government offered documents such as police reports to show that the defendant's actual convictions were "violent felonies." Id. at 1257. The Court held that judges were prohibited from resolving a disputed fact about a prior conviction if doing so required information, such as the data found in police reports, that was not inherent in that prior conviction. Id.

The Court set out the various types of sources upon which a court could rely upon in addition to the statutory definition. When the prior conviction has been obtained through a jury trial, the sentencing court is limited to examining the charging documents filed in the court of conviction and any instructions given to the jury. Id. at 1259 (citing Taylor v. United States, 495 U.S. 575 (1990)). In cases tried without a jury, the later court could look to the "bench-trial judge's formal rulings of law and findings of fact . . . ." Id. In pleaded cases, a court may examine "the statement of factual basis for the charge . . . shown by a transcript of plea colloquy or by written plea agreement presented to the court, or by a record of comparable findings of fact adopted by the defendant upon entering the plea." Id. at 1259-60.

We held in Cole, which was decided before Shepard, that the Sims procedure involves a legal determination, and therefore "does not transgress the dictates of Apprendi and its progeny." Cole, 155 S.W.3d at 904. We explained:

> The (i)(2) aggravating circumstance requires only that the statutory *elements* of the prior felony involve the use of violence to the person. The Sims procedure authorizes trial judges merely to examine the facts, record, and evidence *underlying* the prior conviction to ascertain which "statutory elements" served as the basis of the prior felony conviction. This is a legal determination that neither requires nor allows trial judges to make factual findings as to whether the prior conviction involved violence.
> . . .
>
> Furthermore, by making this legal determination, the trial court neither inflicts punishment nor usurps or infringes upon the jury's role as fact-finder. Once the trial court determines as a matter of law that the statutory elements of the prior convictions involve the use of violence, the jury must then determine as matters of fact whether the prosecution has proven the (i)(2) aggravating circumstance beyond a reasonable doubt and whether aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. The jury alone must decide these factual

questions, and these are the factual questions that determine whether the maximum sentence of death will be imposed. Additionally, the facts underlying prior convictions are themselves facts that either were found by a jury's verdict of guilt or facts that were admitted by a plea of guilty.

Id.

Shepard does not change a judge's ability to find the "fact of a prior conviction." It does, however, limit the scope of the judge's inquiry to reliable judicial records regarding the prior conviction and precludes the judge from re-examining the facts underlying that conviction. This is not to say that a judge is limited only to looking at the fact that there was a prior conviction. The judge may look at such things as the charging documents, jury instructions, plea agreements or transcripts of the colloquy between judge and defendant in which the defendant confirms the factual basis for the plea, or bench-trial judges' findings of fact and rulings of law in order to determine if the statutory elements of that prior crime met those necessary to establish the aggravating circumstance.

A Sims hearing is required where the statutory elements of the prior felony do not necessarily involve the use of violence to the person. In such a case, the trial judge, outside the presence of the jury, should consider the prior felony to determine whether the elements of that offense involved the use of violence to the person. If the trial court determines that the statutory elements of the prior offense involved the use of violence, the State may introduce evidence that the defendant had previously been convicted of that prior offense. The trial court then would instruct the jury that the prior conviction involved the use of violence to the person. In looking at the underlying facts of the prior felony, the trial judge is limited to examining the types of court documents approved of in Shepard. If, from those documents, it still remains unclear as to whether the prior crime involved the use of violence to the person, it would then become a determination for the jury to make.

In this case, the trial court erred in failing to conduct the necessary Sims analysis of the prior aggravated assault conviction. As such, the jury's consideration of the prior violent felony aggravating circumstance was likewise in error. However, we find this error to be harmless beyond a reasonable doubt in light of the two remaining valid aggravating circumstances and relatively weak mitigating evidence. See discussion infra, Part G.1.

### C. Restriction on Cross-Examination of Evans

The defendant next argues that the trial court erred in restricting his cross-examination of Evans. Approximately three months prior to the defendant's trial, Evans pled guilty to possession with intent to sell cocaine and received a reduced sentence of six years on community corrections. The State elicited the fact of this conviction on direct examination, but there was no mention of the sentence. The defendant argued at trial that because the sentencing range for Evans' offense was eight to twelve years, he should be allowed to ask Evans whether he received a favorable deal from the State in exchange for his testimony, thus making Evans biased in favor of the State. The trial

court ruled that the defendant would not be permitted to question Evans about his motivation for testifying because the defendant had not shown proof that the State offered Evans a deal in exchange for his testimony:

> I'm going to require you to follow the law which is you may ask this witness, "Are you the same John Doe that was convicted on such and such a date in indictment such-and-such of this offense, and received this sentence." Period, end of discussion. The law does not allow you to look behind that . . . .

The defendant was allowed to elicit testimony that Evans received a six-year sentence, but not that the sentence was served on community corrections and not in jail.

The right to examine a witness for bias is a fundamental right. Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986); State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001). A defendant's right to examine a witness to impeach his or her credibility or to establish that the witness is biased includes the right to examine a witness regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness. Sayles, 49 S.W.3d at 279 (citing State v. Smith, 893 S.W.2d 908, 924 (Tenn. 1994); State v. Spurlock, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993)).

"The exercise of this right is 'controlled by the trial judge and his discretion will not ordinarily be disturbed.'" Sayles, 49 S.W.3d at 279 (quoting Davis v. State, 212 S.W.2d 374, 375 (Tenn. 1948)). Therefore, the trial court's decision will be upheld absent an abuse of discretion. Sayles, 49 S.W.3d at 279. Although the trial court retains discretion regarding the exercise of the right to examine witnesses for bias, any undue restriction on that right may violate a defendant's right to confrontation under the Sixth Amendment of the United States Constitution and Article I, Section 9, of the Tennessee Constitution. Id.; Smith, 893 S.W.2d at 924; State v. Black, 815 S.W.2d 166, 177 (Tenn.1991). To show a violation of the right, the defendant must show that "'he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, thereby exposing to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witnesses.'" Black, 815 S.W.2d at 177 (quoting Van Arsdall, 475 U.S. at 680).

The State concedes that the trial court erred in refusing to allow defense counsel to explore Evans' potential bias. The question thus becomes whether the error was harmless beyond a reasonable doubt.

"Once a constitutional error has been established, as in this case, the burden is on the State to prove that the constitutional right violation is harmless beyond a reasonable doubt." Momon v. State, 18 S.W.3d 152, 167 (Tenn. 1999). The United States Supreme Court stated in Van Arsdall that a violation of the right to confrontation may be deemed harmless "if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." 475 U.S. at 681.

The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

Id. at 684.

The Court of Criminal Appeals found that the error was harmless beyond a reasonable doubt. The intermediate court noted that Evans was not the only witness who had incriminated the defendant and that most of Evans' testimony was corroborated by other witnesses, including the defendant himself. The court also considered the overall strength of the State's case.

Evans testified that on the day of the victim's disappearance, he saw the defendant and the victim leave the defendant's house together and walk toward the Amoco station on Bellevue. He said that he saw them walk past the station through the pathway into the woods. This evidence was corroborated by Willie Lee Hall's testimony that the defendant and the victim left the house together that day. It was also corroborated by the defendant's own statement that he lured the victim down the pathway and into the woods. Evans further testified that he overheard conversations between the defendant and Mario in which they discussed killing the victim's mother. The defendant admitted to having conversations with Mario about killing the victim's mother, who was then the defendant's wife. Because Evans' testimony was corroborated by other witnesses and because of the overall strength of the prosecution's case, we hold that the trial court's error in failing to allow the defendant to cross-examine Evans for bias was harmless beyond a reasonable doubt.

### D. Exclusion of Evidence Showing Guilt of Evans

The Defendant contends that the trial court improperly denied his request to introduce evidence that would have implicated Evans in the murder of the victim. Specifically, he sought to introduce evidence that Evans had a reputation for being violent and that he had engaged in sexual relations with several teenage girls. The trial court found that the evidence regarding Evans' alleged violent character and his alleged sexual relationships was irrelevant absent "proof to link [Evans] directly to this crime." The defendant argues that the court's exclusion of this evidence on irrelevancy grounds effectively deprived him of his right to present a complete and meaningful defense.

Criminal defendants have a constitutional right, implicit in the Sixth Amendment, to present a defense, and this right is "a fundamental element of due process of law." State v. Brown, 29 S.W.3d 427, 432 (Tenn. 2000) (quoting Washington v. Texas, 388 U.S. 14, 19 (1967)); see also

Crane v. Kentucky, 476 U.S. 683, 690 (1986); Chambers v. Mississippi, 410 U.S. 284, 294 (1973). A proper defense includes the right to introduce evidence that someone other than the accused committed the crime. Powers, 101 S.W.3d at 394 (citing Sawyers v. State, 83 Tenn. (15 Lea) 694, 695 (1885)).

In Powers, this Court addressed the standard for the determination of whether evidence regarding a third party defendant is admissible. 101 S.W.3d at 394-95. We rejected the "direct connection" test, which required that the evidence "must directly connect the third party with the substance of the crime and must clearly point out someone besides the accused as the guilty person in order to be admissible." Id. at 395. We held that this "standard imposed too high a threshold for the admissibility of evidence concerning third-party culpability" and that the Rules of Evidence were "adequate to determine whether such evidence is admissible." Id.

In this case, the trial court held that the evidence regarding Evans was not relevant because there was no "proof to link [Evans] *directly* to this crime." (Emphasis added). While the trial court couched its decision to exclude the evidence in terms of relevancy, it appears that the trial court was actually applying the "direct connection" test that this Court rejected in Powers. Instead of requiring proof linking Evans directly to the crime, the trial court should have simply evaluated the evidence under the general relevance standards found in the Rules of Evidence.

Evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence that a third party had the motive and opportunity to commit the offense has been deemed relevant to a criminal prosecution. See Powers, 101 S.W.3d at 395; see also State v. Stevens, 78 S.W.3d 817, 836-37 (Tenn. 2002) (evidence that the third party had a tendency to get violent after arguments with his mother was relevant and admissible to show that the third party committed the murders of his own volition and not because he was hired by the defendant).

One of the defendant's theories of defense is that Evans committed the rape and murder of the victim. In support of that theory, the defendant first points to evidence in the record that the defendant contends implicates Evans in the crime: Evans is a convicted felon; he knew the victim; he was the one who found the victim's body and led the police to the body; he implicated the defendant in the crime, thus removing suspicion from himself; and Evans' testimony regarding his suspicions about the defendant and that he hid under a house for three nights in order to listen to the defendant "bordered on the incredible." The defendant next sought to introduce evidence that Evans had a violent nature and that he had sexual relations with underage girls, in an effort to establish motive for Evans to have committed the crime. The question, therefore, is whether this evidence makes "any fact that is of consequence . . . more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Under this test, the evidence of Evans' propensity for violence and his sexual tendencies is relevant as it tends to make the fact of his involvement in the crime more probable than it would be without the evidence. Thus because the evidence is relevant and obviously not prejudicial to the defendant, the trial court erred in denying the defendant's request to produce

-23-

evidence of Evans' propensity for violence and of his sexual tendencies.

Having determined that the trial court erred in excluding this evidence, we must now determine whether that error was harmless. The defendant claims that the trial court's exclusion of the evidence effectively deprived him of his due process right to present a meaningful defense. When an error affects a constitutional right, it is considered constitutional error and is presumed to be reversible "unless the reviewing court is convinced 'beyond a reasonable doubt' that the error did not affect the trial outcome." State v. Harris, 989 S.W.2d 307, 315 (Tenn. 1999).

An evidentiary ruling ordinarily does not rise to the level of a constitutional violation. See Crane, 476 U.S. at 689 ("We acknowledge also our traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts."). As we explained in Brown, "[t]he facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of evidence." 29 S.W.3d at 433. In determining whether the constitutional right to present a defense has been violated by the exclusion of evidence, the analysis should consider whether: "1) the excluded evidence is critical to the defense; 2) the evidence bears sufficient indicia of reliability; and 3) the interest supporting exclusion of the evidence is substantially important." Id. at 433-34 (citing Chambers, 410 U.S. at 298-301); see also United States v. Scheffer, 523 U.S. 303, 315 (1998) (the exclusion of evidence violates the constitutional right to a defense when it "significantly undermine[s] fundamental elements of the accused's defense").

In Chambers, the defendant was not allowed to introduce evidence that another person had confessed to the crime, and the United States Supreme Court held that "the exclusion of this critical evidence . . . denied [the defendant] a trial in accord with traditional and fundamental standards of due process." 410 U.S. at 302. The evidence that the defendant sought to introduce in this case, however, falls far short of the critical evidence considered in Chambers.

Our decision is in accord with prior decisions of this Court in which we have held that a trial court's error in excluding evidence of a third party's culpability was harmless error. In Powers, we found that while the trial court erred in excluding certain evidence implicating a third party, that error did not amount to a due process violation under the standards set forth in Chambers and adopted by this Court in Brown. Powers, 101 S.W.3d at 397. The evidence in question in Powers related to the victim's husband. Specifically, the evidence would have shown that someone had seen the victim and her husband the night before the victim disappeared; that the victim was shaking and attempting to hide from her husband; and that the victim's husband later denied being out with the victim on the night in question. In addition to finding no due process violation, we also concluded that the error was harmless because of the overwhelming evidence establishing the defendant's guilt. Id. at 397-98.

Likewise, in Stevens, we held that the trial court erred in excluding evidence offered by the defendant to establish a third party defense. 78 S.W.3d at 836-37. However, we held that the error was harmless given the "overwhelming evidence of the defendant's participation in these murders,"

-24-

explaining that "[w]e have long recognized that 'the line between harmless and prejudicial error is in direct proportion to the degree . . . by which proof exceeds the standard required to convict. . . .'" Id. at 838 (quoting Spicer v. State, 12 S.W.3d 438, 447-48 (Tenn. 2000)).

Considering the strength of the State's evidence against the defendant and the relatively weak probative value of the evidence sought to be introduced by the defendant, we conclude that the error was harmless beyond a reasonable doubt. By his own admission, the defendant lured the victim into the woods where he had agreed with Mario that they would kill her. Once in the woods, the victim was stabbed sixteen times and left to die. The defendant was able to lead the police directly to the location where the victim's body had been found and to explain how the murder occurred. With respect to the allegation of rape, the evidence showed that the victim was found with her overalls and underwear pulled down around her ankles, and the forensic pathologist testified that there was a high probability that the victim suffered bruising or injury to her vaginal area consistent with rape prior to death. The defendant admitted, after being asked to provide a DNA sample, to having sexual relations with the victim. His story, however, was inconsistent with the testimony of his step-father, Hall. Because of the overwhelming evidence of the defendant's guilt, any error by the trial court in refusing to admit evidence regarding Evans was harmless beyond a reasonable doubt.

### E. Refusal to Let Defendant Sit at Defense Table

Prior to jury selection, defense counsel asked the trial judge to allow the defendant to sit next to him at the counsel table. The trial judge declined the request, noting that he did not believe that requiring the defendant to sit behind his attorney would critically hinder attorney-client communications. The defendant sat on a bench located about a foot to eighteen inches behind counsel table. The trial judge said that he would allow counsel to sit on the bench if necessary to talk to the defendant and noted that counsel could ask for leave of court to talk with the defendant for a long period of time.

The defendant argues that the trial court's refusal to allow him to sit with his attorneys at counsel table violated his due process rights as guaranteed by the Fourteenth Amendment to the United States Constitution and Article 1, Section 8 of the Tennessee Constitution. He contends that the refusal to let him sit at the defense counsel table eroded the presumption of innocence, thus denying him a fair trial. He compared this to requiring a defendant to wear prison garb or shackles in the courtroom. The Court of Criminal Appeals held that whether a defendant should be permitted to sit at counsel table is a matter within the sound discretion of the trial court, and the defendant must show some prejudice from the seating arrangement to receive relief. The court concluded that the seating arrangement in this case did not impair the presumption of innocence and the defendant had not proved prejudice.

Rule 8.05 of the Rules of Practice and Procedure for Shelby County Criminal Court provides that "[w]here space is available and with permission of the Court, the defendant may sit at counsel table with his or her attorney." Thus, the local rule leaves to the discretion of the trial judge whether

the defendant may sit at the table with counsel. The issue of whether Local Rule 8.05 violates due process is one of first impression in Tennessee.

"In general, the course and conduct of trial proceedings rests within the sound discretion of the trial court." State v. King, 40 S.W.3d 442, 449 (Tenn. 2001) (citing State v. Cazes, 875 S.W.2d 253, 260 (Tenn. 1994)). Other jurisdictions have likewise held that whether the defendant should be permitted to sit at the defense counsel table is within the sound discretion of the trial court. See, e.g., Webster v. State, 680 S.W.2d 906, 908 (Ark. 1984); Commonwealth v. Moore, 393 N.E.2d 904, 907 (Mass. 1979); State v. Johnson, 462 P.2d 933, 935 (Wash. 1969); Hopkinson v. State, 679 P.2d 1008, 1028 (Wyo. 1984). Moreover, other jurisdictions require that a defendant must show some prejudice as a result of being seated behind counsel or he has no ground for complaint. See Webster, 680 S.W.2d at 908.

The highest court in Massachusetts has held that the seating of a defendant elsewhere than at counsel table does not "dilute the presumption of innocence." Commonwealth v. Lockley, 408 N.E.2d 834, 840 (Mass. 1980) (citation omitted). Likewise, the First Circuit distinguished placing a defendant in the front row of seats from ordering the defendant to sit in the "dock," which is a four-foot high box in which the defendant is isolated. The court stated that "the defendants sat in the front row of the spectator's area of the courtroom, hardly a place calculated to strip an accused of his presumption of innocence in the eyes of the jury." United States v. Turkette, 656 F.2d 5, 10 (1st Cir. 1981). Similarly, in State v. Johnson, the Supreme Court of Washington held that the seating arrangement whereby the defendant and his counsel sat at the counsel table farthest from the jury box during voir dire did not prejudice the defendant and was not an abuse of the trial court's discretion. 462 P.2d at 935.

Requiring the defendant to sit directly behind his attorneys is not the same as making the defendant wear prison attire or shackles in the courtroom, which would suggest to the jury that he is a danger. While it is the better practice to allow a defendant to sit at counsel table, we conclude that the trial court did not abuse its discretion in this case by ordering the defendant to sit in the first row behind defense counsel's table. The seating arrangement did not impair the defendant's presumption of innocence. Nor did the court's order impact the defendant's ability to communicate with counsel. The defendant was seated on a bench less than two feet behind counsel table, and the court assured counsel that he could sit next to the defendant on the bench if he needed to talk to him. Furthermore, the defendant has failed to show how he was prejudiced by the seating arrangement, and a showing of prejudice is necessary in order to obtain relief.

### F. Lesser-Included Offense of Facilitation

At the close of proof at the guilt phase, the defendant's counsel orally requested that the trial court instruct the jury on all lesser-included offenses of first degree premeditated murder and first degree felony murder, including facilitation. The trial court denied the request, finding that there was no factual basis to support a charge of facilitation.

The defendant argues that the trial court erred in not instructing the jury on the lesser-included offense of facilitation. The State argues that the defendant waived an instruction on facilitation because he did not file a written request for the lesser-included instructions as required by Tennessee Code Annotated section 40-18-110. The State contends that under that section, absent a written request for an instruction on a lesser-included offense, a defendant may not present failure of the trial court to instruct the jury on the lesser-included offense as a ground for relief either in the motion for new trial or on appeal.

Prior to the 2002 amendment to Tennessee Code Annotated section 40-18-110, that section provided that a trial court was required to instruct on all lesser-included offenses supported by the evidence even in the absence of a request to do so. The amendment, effective for all cases tried on or after January 1, 2002, provides as follows:

> (c) Notwithstanding any other provision of law to the contrary, when the defendant fails to request the instruction of a lesser included offense as required by this section, such instruction is waived. *Absent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for a new trial or on appeal*.

Tenn. Code Ann. § 40-18-110 (emphasis added).

We recently held in State v. Page, __ S.W.3d. __ (Tenn. 2006), that "[t]he current version of section 40-18-110(c) subjects the right to lesser-included offense instructions to the general rule that issues concerning incomplete instructions are deemed waived in the absence of an objection or special request." Id. at __. While section 40-18-110(c) precludes a defendant who fails to request a lesser-included offense instruction in writing from seeking plenary appellate review of the issue, an appellate court is not precluded from sua sponte reviewing the lesser-included offense issue under the plain error doctrine. Id. at __.

In this case, the defendant failed to request in writing an instruction on the lesser-included offense of facilitation and is therefore precluded under section 40-18-110 from seeking plenary appellate review of the issue. We will look, however, to whether the trial court's failure to instruct on the lesser-included offense of facilitation was plain error. We hold that it was not.

Facilitation of the charged offense is a lesser-included offense under the test established in State v. Burns, 6 S.W.3d 453 (Tenn. 1999).[3] Therefore, the issue becomes whether the evidence presented at trial was sufficient to support an instruction for facilitation. In Burns, we held that a two-step analysis is necessary to determine if an instruction on a lesser-included offense is supported by the evidence. First we must determine if any evidence exists that "reasonable minds could accept

---

[3] In Burns, we stated that an offense is a lesser-included offense of the greater if "(c) it consists of . . . facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offenses in part (a) or (b) . . . ." 6 S.W.3d at 466-67.

as to the lesser-included offense. Second, we must determine if the evidence when viewed liberally in the light most favorable to the existence of a lesser-included offense, is legally sufficient to support a conviction for the lesser-included offense." State v. Richmond, 90 S.W.3d 648, 660 (Tenn. 2002) (citing Burns, 6 S.W.3d at 469).

"A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a) (1997). A person is criminally responsible for the conduct of another under section 39-11-402(2) if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense."

In order for reasonable minds to find the defendant guilty of facilitation of first degree premeditated murder, the jury would have to conclude that the defendant provided Mario with substantial assistance, knowing that Mario intended to commit premeditated murder, but without the intent to promote the murder nor benefit in the result. Similarly, in order for reasonable minds to find the defendant guilty of facilitation of first degree felony murder, the jury would have to conclude that the defendant provided Mario with substantial assistance in the commission of the rape, knowing that Mario intended to commit rape, but not acting with the intent to promote rape nor benefit in the results.

According to the defendant's own statement to the police: (1) the defendant and Mario planned to take the victim into the woods to kill the victim, where she was later found dead; (2) the defendant walked into the woods behind the Amoco station with the victim; (3) he and the victim met Mario in those woods; (4) the victim inexplicably removed her clothes when talking to Mario; (5) Mario stabbed the victim multiple times; and (6) the defendant ran when Mario stabbed the victim. The defendant then offered evidence from several witnesses who testified that Mario was with them on the day of the victim's disappearance.

As the Court of Criminal Appeals noted, this evidence is susceptible to the following interpretations: (1) the defendant acted alone, lured the victim to the secluded area, raped her, and then murdered her; (2) the defendant acted alone and murdered the victim, but did not rape her; (3) the defendant and Mario planned the victim's murder and the defendant lured the victim to the location where Mario laid in wait and murdered her; (4) neither the defendant nor Mario had any involvement in the victim's murder. Under none of those interpretations of the evidence do the defendant's actions qualify as those of a facilitator. Thus, the trial court did not commit error in refusing to instruct the jury on facilitation. We agree with the intermediate appellate court. The defendant is not entitled to relief on this issue.

### G. Tenn. Code Ann. § 39-13-206(c)(1)

When reviewing a sentence of death, we are required by statute to determine whether:

(A) The sentence of death was imposed in any arbitrary fashion;

(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Tenn. Code Ann. § 39-13-206(c)(1) (2003).

### *1. Aggravating and Mitigating Circumstances*

The jury found the existence of three aggravating circumstances: (1) "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person"; (2) "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death"; and (3) "[t]he murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit . . . any . . . rape . . . ." Tenn. Code Ann. § 39-13-204(i)(2), (5), (7) (1997).

As discussed above, we hold that the evidence is sufficient to support the jury's findings that the (i)(5) and (i)(7) aggravating circumstances had been established beyond a reasonable doubt. However, there was insufficient evidence to support the jury's finding that aggravating circumstance (i)(2) regarding the prior violent felony had been established.

Errors affecting the jury's consideration of an invalid aggravating circumstance in a capital sentencing proceeding are subject to harmless error analysis. See Strouth v. State, 999 S.W.2d 759, 760 (Tenn. 1999). The error is harmless if the reviewing court concludes "beyond a reasonable doubt that the sentence would have been the same had the jury given no weight to the invalid . . . factor." State v. Howell, 868 S.W.2d 238, 262 (Tenn. 1993). In Howell, we stressed that the reviewing court must "completely examine the record for the presence of factors which potentially influence the sentence ultimately imposed," including "the number and strength of remaining valid aggravating circumstances, the prosecutor's argument at sentencing, the evidence admitted to establish the invalid aggravator, and the nature, quality and strength of mitigating evidence." 868 S.W.2d at 260-61.[4]

---

[4] The United States Supreme Court recently held that:

An invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing

(continued...)

Applying the analysis in this case leads us to conclude that the error is harmless beyond a reasonable doubt and does not require re-sentencing. The evidence of the two remaining valid aggravating circumstances, that the murder was heinous, atrocious, or cruel and that the murder was committed during the perpetration of a rape, was overwhelming. The thirteen-year-old victim was viciously stabbed sixteen times, suffering defensive wounds in the process, and then left to die. The evidence further showed that she was found with her shorts and underwear around her ankles, and the medical examiner testified that the advanced decomposition of the vaginal area was indicative of trauma to that region.

In mitigation, the defendant presented evidence that he had a low I.Q., used drugs, had suffered the loss of many family members, and at age sixteen, witnessed an armed robbery during which someone was killed. While the defendant presented evidence that he suffered a delusional and paranoid disorder that "would impair [his] ability to construe, to manage to make sense out of day-to-day situations," there was no evidence presented that the defendant did not know what he was doing or that he did not understand the wrongfulness of his actions.

Considering the strength of the two valid aggravating circumstances and the relatively weak mitigating evidence, we hold that the evidence supports the finding, beyond a reasonable doubt, that the valid aggravating circumstances outweigh the mitigating circumstances. Thus, the defendant's sentence would have been the same had the jury given no weight to the prior violent felony aggravating circumstance, making the jury's consideration of the invalid evidence harmless error.

## 2. Comparative Proportionality Review

In cases where a defendant has been sentenced to death, we are required to conduct a comparative proportionality review pursuant to Tennessee Code Annotated section 39-13-206(c)(1)(D) (1997). Comparative proportionality review seeks to ensure that the death penalty is applied consistently and not arbitrarily or capriciously. Terry v. State, 46 S.W.3d 147, 163 (Tenn. 2001). Our analysis is intended to determine whether the defendant's sentence of death "is disproportionate to the sentences imposed for similar crimes and similar defendants." Bland, 958 S.W.2d at 664.

In undertaking this analysis, we apply the precedent-seeking method of comparative proportionality review, in which we compare the present case with other cases involving similar

---

[4] (...continued)
process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances.

Brown v. Sanders, No. 04-980, slip op. at 7-8 (U.S. January 11, 2006). This new test does not alter our analysis or the result in this case. The test currently in use in Tennessee is more strict than that announced by the United States Supreme Court in Brown. In this State, the mere submission of an invalid aggravating circumstance to the jury amounts to constitutional error, see Strouth, 999 S.W.2d at 760, and that error remains subject to a harmless error analysis, see Howell, 868 S.W.2d at 262.

defendants and similar crimes. See id. We examine the facts and circumstances of the crime, the defendant's characteristics, and the aggravating and mitigating factors involved. Id. Because no two defendants or crimes are identical, we cannot limit our comparison to those cases where a defendant's death sentence is "perfectly symmetrical." Id. at 665. Rather, we seek only to "identify and invalidate the aberrant death sentence." Id. A sentence of death is disproportionate when "the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." Id. at 668.

The pool of cases we consider in a comparative proportionality review includes those first degree murder cases in which the State sought the death penalty, a capital sentencing hearing was held, and the jury determined whether the sentence should be life imprisonment, life imprisonment without possibility of parole, or death. State v. Godsey, 60 S.W.3d 759, 783 (Tenn. 2001); Bland, 958 S.W.2d at 666. Several nonexclusive factors are relevant to identifying and comparing similar cases: (1) the means of death; (2) the manner of death, such as whether the death was violent or torturous; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on non-decedent victims. Terry, 46 S.W.3d at 164; see also State v. Henderson, 24 S.W.3d 307, 316 (Tenn. 2000). Also, we have identified several nonexclusive factors relevant to comparing the defendant's characteristics, including: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); and (8) the defendant's capacity for rehabilitation. Terry, 46 S.W.3d at 164; Henderson 24 S.W.3d at 316.

In this case, the defendant lured the victim, his thirteen-year-old step-daughter, into the woods, raped her, and stabbed her sixteen times, ultimately causing her death. The mitigation evidence focused on the defendant's low I.Q., his use of drugs, the fact that he witnessed a violent crime at the age of sixteen, and the existence of certain mental impairments which were not serious enough to impair his understanding of right from wrong.

We conclude that the defendant's sentence of death in this case was not applied arbitrarily and was not excessive or disproportionate when compared to similar cases in which the same penalty was imposed. We have upheld the death penalty in several similar cases where the defendant raped and then killed a very young victim in a manner that was heinous, atrocious or cruel. See State v. Keen, 31 S.W.3d 196 (Tenn. 2000) (defendant raped and strangled his girlfriend's eight-year-old daughter and was sentenced to death based on the aggravating circumstances that the victim was under twelve and the murder was heinous, atrocious or cruel); State v. Vann, 976 S.W.2d 93 (Tenn. 1998) (defendant raped and strangled to death his eight-year-old daughter, and was sentenced to death based on aggravating circumstances that the victim was under age twelve, the defendant had been convicted of a prior violent felony, and the murder was heinous, atrocious or cruel); State v. Teel, 793 S.W.2d 236 (Tenn. 1990) (defendant lured a fourteen-year-old girl into the woods, raped

and killed her; sentence of death was based on aggravating circumstances that the defendant had been convicted of a prior violent felony, and the murder was heinous, atrocious or cruel); State v. Irick, 762 S.W.2d 121 (Tenn. 1988) (defendant raped seven-year-old girl he was babysitting and suffocated her to death; sentence of death was based on aggravating circumstances that the victim was under age twelve, the murder was heinous, atrocious or cruel, the murder was committed to avoid arrest or prosecution, and the murder was committed during a rape); State v. Coe, 655 S.W.2d 903 (Tenn. 1983) (defendant kidnapped, raped and strangled eight-year-old girl; death sentence was based on aggravating circumstances that the victim was under age twelve, the murder was heinous, atrocious or cruel, the murder was committed to avoid arrest or prosecution, and the murder was committed during a rape).

We have also upheld the death penalty in other cases in which the defendant stabbed the victim to death and upon a finding of the (i)(5) and/or the (i)(7) aggravating factors. See, e.g., State v. Bush, 942 S.W.2d 489 (Tenn. 1997) (imposing the death penalty where the defendant murdered a seventy-nine-year-old widow upon finding aggravating circumstance (i)(5)); State v. Harris, 839 S.W.2d 54 (Tenn. 1992) (imposing death penalty for murders of two victims, where victims had been both shot and stabbed, but fatal wound as to one victim was a deep cut to the throat that cut the trachea and major blood vessels and chipped the spinal column); State v. Payne, 791 S.W.2d 10 (Tenn. 1990) (imposing death penalty for stabbing two victims, where one victim was stabbed forty-one times and the second was stabbed nine times upon finding aggravating circumstances (i)(3) and (i)(5)); State v. Jones, 789 S.W.2d 545 (Tenn. 1990) (imposing death penalty where the defendant murdered the victim who was stabbed six times after being bound, gagged and blindfolded, upon finding of (i)(2), (i)(5), and (i)(6) aggravating circumstances); State v. Thompson, 768 S.W.2d 239 (Tenn. 1989) (imposing death penalty where female victim was taken to a remote location and stabbed repeatedly, upon finding aggravating circumstances (i)(5), (i)(6), and (i)(7)); State v. West, 767 S.W.2d 387 (Tenn. 1989) (imposing the death penalty where defendant separated mother and daughter, restrained the victims, and stabbed one victim seventeen times and the other victim numerous times, upon finding of aggravating circumstances (i)(5) and (i)(7)).

While no two capital cases are identical, we have compared the circumstances of the present case and the present defendant with the circumstances of the cases set out above and those individual defendants and conclude that this case is not plainly lacking in circumstances consistent with other similar cases in which the death penalty has been imposed. Thus, the defendant's sentence of death is not disproportionate considering the circumstances of the crime and the defendant.

**CONCLUSION**

After considering the entire record in this case we conclude that the defendant is not entitled to relief on any of the issues raised. Furthermore, we find that the sentence of death was not imposed arbitrarily, that the sentence of death is not excessive or disproportionate, and that the evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. With respect to issues not specifically addressed within this opinion, we affirm the decision of the Court of Criminal Appeals. Relevant portions of that opinion are

published hereafter as an appendix. The defendant's conviction and sentence are affirmed. The sentence of death shall be carried out as provided by law on the twenty-eighth day of June, 2006, unless otherwise ordered by this Court or other proper authority.

It appearing that the defendant is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
WILLIAM M. BARKER, CHIEF JUSTICE