IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 26, 2014

# STATE OF TENNESSEE v. LESLIE DEAN RITCHIE, JR.

**Appeal from the Criminal Court for Carter County**
**No. 21398     Honorable Robert E. Cupp, Judge**

---

**No. E2013-01849-CCA-R3-CD - Filed May 19, 2014**

---

A Carter County Criminal Court jury convicted the Defendant-Appellant, Leslie Dean Ritchie, Jr., of two counts of soliciting sexual exploitation of a minor, a Class B felony. See T.C.A. § 39-13-529(a) (Supp. 2009). The trial court sentenced Ritchie as a Range I, standard offender to concurrent sentences of ten years in confinement. Ritchie's sole issue on appeal is that the evidence is insufficient to sustain his two convictions. Upon review, we remand the case for entry of a corrected judgment in count two to reflect that the jury convicted Ritchie of the offense of soliciting sexual exploitation of a minor rather than that Ritchie entered a guilty plea to this offense and to reflect that the sentence in count two is concurrent with the sentence in count one. In all other respects, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded for Entry of Corrected Judgment**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JEFFREY S. BIVINS and ROGER A. PAGE, JJ., joined.

Guy T. Wilkinson, District Public Defender; and David H. Crichton, Assistant District Public Defender, Elizabethton, Tennessee, for the Defendant-Appellant, Leslie Dean Ritchie, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Anthony W. Clark, District Attorney General; and Dennis D. Brooks, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The victim, K.B.,[1] who was fourteen years old at the time of trial, testified that Ritchie had been her mother's boyfriend at the time the offenses in this case occurred. When the victim was in the fifth or sixth grade, her mother's home flooded, and they moved into Ritchie's house. The victim did not receive a weekly allowance from her mother, so Ritchie began giving her money if she allowed him to look at her in her bra and underwear. She said that Ritchie gave her anywhere from five to twenty dollars depending on the type of undergarments she wore. When the State inquired if Ritchie ever asked her to take off her underwear, the victim replied, "[Ritchie] just kind of hint[ed] around the bush [that] he wanted me to take my underwear off and he'd give me more [money] than what he [had been giving me]." The victim said she refused to take off her underwear. However, she said she removed her bra and showed Ritchie her breasts on two different occasions. One incident occurred in the living room, and the other incident took place in a bedroom. During one of these incidents, Ritchie asked her to "play with [her] breasts," but she refused. The victim said that Ritchie did not touch her and did not ask to touch her during these incidents. She stated that she was twelve years old at the time these two incidents occurred.

Some time after her sixth-grade year, the victim and her mother moved out of Ritchie's house, and Ritchie began coming by their new home. The victim said Ritchie followed her around, which was "weird" and "[c]reepy." She said that whenever she would go over to the home of her neighbor, Tonya Breland, to spend time with Breland's children, Ritchie would tell her to come home or there would be "consequences." Shortly thereafter, the victim's mother ended the relationship with Ritchie.

On cross-examination, the victim stated that incidents involving Ritchie occurred while her mother was at work. She admitted that she never told her mother about these incidents until much later. She also admitted that once these incidents became "routine," there "were times" that she would offer to show herself to Ritchie for money. The victim said she could not remember the exact days that she showed her breasts to Ritchie. She said that when she told her mother of the incidents involving Ritchie, they did not immediately contact the police because she was at summer camp. When she returned home, the victim spoke with an investigator and a representative with the Child Advocacy Center in Johnson City.

M.E., the victim's mother, testified that she had originally met Ritchie twenty years earlier. After meeting him again, they "dated on and off for a little while[.]" While she was dating Ritchie, M.E. and the victim moved into Ritchie's house and lived there from August 2009 to August 2010. During this time period, Ritchie bought the victim "thongs and see[-

---

[1] This court identifies the minor victims of sexual offenses and their immediate family members by their initials only.

]through panties and just stuff totally inappropriate for a little girl like her." Ritchie claimed that the victim had chosen these items herself. M.E. believed that Ritchie had bought these undergarments for the victim because the victim did not have any money. She said that she and Ritchie "went round and round over [the victim] having those [underwear] and [Ritchie] continued to say it was [the victim's] idea." He said "he didn't know why I was making such a big deal out of it, that I was blowing things out of proportion and I was paranoid[.]" Ritchie also informed M.E. that the victim was sneaking out of the house to see boys, which she knew was not true, because the victim slept with her in her bed. She said she finally agreed to have Ritchie install a security system so that he would stop claiming the victim was sneaking out of the house to see boys.

M.E. said that she first learned about Ritchie's offenses against the victim when the victim briefly came home from summer camp. She said the victim seemed "[a]shamed [and] scared" when she told her that Ritchie "had been paying her to do things for him." M.E. became extremely upset and drove to Ritchie's home. When she realized he was not home, she destroyed several of his belongings. She then drove to Ritchie's job and convinced him to come outside by telling him that the victim wanted to talk to him. When Ritchie leaned in the window of the truck to talk to the victim, M.E. came around the side, hit Ritchie with a wooden board, and screamed that "he was a pedophile, pervert." Ritchie began screaming at the victim, "[W]hy are you doing this?" When Ritchie's co-workers decided to call the police, Ritchie tried to stop them. Ritchie claimed that the victim had made the story up and had "fifteen different reasons why . . . it didn't happen." When M.E. asked the victim what happened, Ritchie cut her off and said, "She started it." When the Johnson City officers arrived, M.E. told them that Ritchie had blamed the victim for these incidents.

On cross-examination, M.E. said it took three weeks from the time she learned of the offenses to press charges against Ritchie because she did not know that the officers in Johnson City were not going to relay the information about Ritchie's offenses to the officers in Carter County. M.E. said that she had wanted the victim to finish volunteering at camp and that the victim had needed time to build up her courage to disclose the crimes. Regarding these offenses, M.E. said she believed Ritchie "told [the victim] what to do and she did it[.]"

On redirect examination, M.E. said that Ritchie accused the victim of talking to boys because he was jealous and did not want her talking to someone other than him. After Ritchie installed the security system, he brought her three handwritten pages containing information about the boys with whom that the victim had communicated on Facebook. She said Ritchie's claims about the victim hanging out with boys were ridiculous because the victim was a little girl who was not allowed to go out or date. M.E. said that when they lived together, Ritchie sometimes drove the victim to school. However, after they moved out,

Ritchie continued to drive the victim back and forth to school even though she had told him repeatedly that her neighbor Tonya Breland was going to drive the victim to school.

Tonya Breland, the victim's neighbor, testified that she had two children and worked as a substitute teacher. After M.E. moved into Breland's neighborhood, the victim and Breland's children often played in her yard and home because M.E. worked long. She said the victim rode to school with her and her children nearly everyday. Whenever the victim spent time at her home while M.E. was at work, Ritchie would come over and tell the victim that she needed to go home or there would be consequences. Breland said that on three different occasions when M.E. was not at home, she had seen Ritchie sitting in his vehicle waiting on the victim so he could take her to school, even though the victim was supposed to be riding with her to school. When Breland confronted Ritchie about the fact that the victim was supposed to be riding with her to school, Ritchie followed her car all the way to school before driving off. Breland also stated that on a dozen occasions, Ritchie would "holler" for the victim from M.E.'s property, and the victim would pretend she did not hear him. Then Ritchie "would just . . . sit there and stare at [the victim until she returned home]." She said that Ritchie's odd behavior began when M.E. and the victim moved in next door and ended when Ritchie and M.E. broke off their relationship.

Randy Bowers, an investigator with the Carter County Sheriff's Department, testified that he investigated this case. He stated that the victim had a "[n]ormal, pleasant" demeanor during his brief interview with her and that she had not gotten upset talking about these incidents like she had during her testimony at trial.

**ANALYSIS**

Ritchie contends that the evidence presented at trial is insufficient to sustain his two convictions for soliciting sexual exploitation of a minor because the State failed to prove (1) that he intentionally commanded, hired, persuaded, induced, or caused the victim to show her breasts to him or (2) that he caused the victim to engage in this sexual activity through an oral communication. Ritchie asserts that the evidence indicating that "the Victim was paid in the past for exhibiting herself in her underwear" is insufficient to sustain his convictions and that "there must be proof as to specifically what the Defendant did to get the Victim to exhibit her breasts." He also argues that because the victim admitted there were "times" that she came to him and offered to show herself to him in exchange for money, the evidence is insufficient to support his convictions because in that scenario he would not have "intentionally commanded, hired, persuaded, induced, or caused" the victim to expose her breasts and the oral communication would have come from the victim and not from him. We conclude that a reasonable jury could have found Ritchie guilty of the two offenses in this case beyond a reasonable doubt.

-4-

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id.

In this case, Ritchie was convicted of two counts of soliciting sexual exploitation of a minor pursuant to Tennessee Code Annotated section 39-13-529(a). This statute provides: "It is an offense for a person eighteen (18) years of age or older, by means of oral . . . communication . . . to intentionally command, hire, persuade, induce or cause a minor to engage in sexual activity or simulated sexual activity that is patently offensive, as defined in §39-17-1002, where such sexual activity or simulated sexual activity is observed by that person[.]" T.C.A. § 39-13-529(a) (Supp. 2009). As relevant in this case, "sexual activity" is defined as "[l]ascivious exhibition of the female breast . . . of any person." Id. § 39-17-1002(8)(G) (Supp. 2009). A person "acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Id. § 39-11-302(a) (Supp. 2009).

Ritchie argues that the State failed to establish that he intentionally induced or caused

the victim to show her breasts to him. A jury may infer intent from the surrounding facts and circumstances so long as there is sufficient proof to sustain the inference. State v. Lowery, 667 S.W.2d 52, 57 (Tenn. 1984) (citations omitted). "Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence." State v. Inlow, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000) (citing State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)). Moreover, "jurors may use their common knowledge and experience in making reasonable inferences from evidence." State v. Meeks, 876 S.W.2d 121, 131 (Tenn. Crim. App. 1993) (citing 23A C.J.S. Criminal Law § 1380).

Viewing the evidence in the light most favorable to the State, we conclude that a reasonable jury could have found Ritchie guilty of two counts of soliciting sexual exploitation of a minor. The victim testified that Ritchie began giving her money if she allowed him to look at her in her bra and underwear. She said Ritchie encouraged her to be more revealing by paying her more money if she wore more provocative undergarments. Then the victim detailed the two incidents that resulted in her revealing her breasts to Ritchie:

> Q. Okay. Did he ever ask you to take your underwear off?
> A. Yeah.
> Q. Okay. Would he ask–what did he say–how did he say it?
> A. He just kind of hint[ed] around the bush he wanted me to take my underwear off and he'd give me more than what he would.
> Q. Did you wind up taking . . .
> A. No.
> Q. . . . taking something off?
> A. I wound up showing him my breasts two times. I never showed him my . . .
> Q. Privates?
> A. Yeah.
> Q. So, did you have to take your bra off those two times to . . .
> A. Yeah.
> Q. . . . show him that? Do you remember where that happened in the house?
> A. Yep.
> Q. Where?
> A. One was in, like, the living room on the couch, and the other one was in the back room that I stayed in.

Based on the above testimony, before the victim revealed her breasts to Ritchie, Ritchie asked her to take her underwear off in exchange for more money. Nothing in the

victim's testimony indicates that she initiated the contact with Ritchie during these two incidents or that Ritchie lacked the desire to engage in this conduct. Moreover, the testimony from M.E. and Tonya Breland corroborated the victim's testimony. M.E. testified that while they lived together, Ritchie purchased "thongs and see [-]through panties" for the victim. When she told him these were inappropriate for a little girl, Ritchie claimed that the victim had chosen the undergarments and told her that she was paranoid. When M.E. confronted Ritchie about these incidents, he first claimed that the victim had made the story up and then claimed that the victim had "started it." Given this proof, we conclude that a reasonable jury could have found that Ritchie, through an oral communication, intentionally commanded, hired, persuaded, induced or caused the victim to reveal her breasts to him on two different occasions. See T.C.A. § 39-13-529(a). Accordingly, he is not entitled to relief.

## CONCLUSION

We remand the case for entry of a corrected judgment in count two to reflect that the jury convicted Ritchie of the offense of soliciting sexual exploitation of a minor and that the sentence in count two is concurrent with the sentence in count one. In all other respects, we affirm the judgments of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE