IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 5, 2018 Session

## STATE OF TENNESSEE v. ANTONIO BENSON

**Appeal from the Criminal Court for Shelby County**
**No. 13-04060        Lee V. Coffee, Judge**

———————————————————

### No. W2017-01119-CCA-R3-CD

———————————————————

A Shelby County Criminal Court Jury convicted the Appellant, Antonio Benson, of first degree premeditated murder, and the trial court sentenced him to life. On appeal, the Appellant contends that the trial court erred by refusing to instruct the jury on self-defense, that the trial court erred by refusing to admit evidence about a prior violent act committed by the victim, that the trial court erred by preventing him from sitting at counsel table during the trial, and that the evidence is insufficient to support the conviction. Based upon the oral arguments, the record, and the parties' briefs, we conclude that the trial court erred by failing to instruct the jury on self-defense and that the State failed to show the error was harmless. Accordingly, the Appellant's conviction is reversed, and the case is remanded to the trial court for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed, Case Remanded**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL AND ROBERT W. WEDEMEYER, JJ., joined.

David Mays (on appeal and at trial) and James Thomas (at trial), Memphis, Tennessee, for the appellant, Antonio Benson.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Karen Cook and Stacy McEndree, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

In August 2013, the Shelby County Grand Jury indicted the Appellant for the first degree premeditated murder of Amy M. Hallmon. At trial, Stacie Hallmon, the victim's sister-in-law, testified that she had known the victim since 2001. At the time of the victim's death, the victim was twenty-three years old and was living with her cousin, Brittany Hamilton, in Millington. The victim had three children, an eight-month-old son and two older daughters, but the victim's children were not living with her. Instead, her son was living with Stacie Hallmon, and her two daughters were living with their grandparents. Hallmon said that the victim had a problem with drugs for "a long time," that she offered to help the victim, and that the victim "would come stay with us, and then just wander off again." A couple of days before the victim's death, Hallmon saw the victim at Walmart, and the victim "seemed okay." Hallmon asked if the victim needed anything, and the victim said no.

On cross-examination, Hallmon acknowledged that the victim's children were not living with the victim due to the victim's drug problem. However, the victim visited her son "[e]very chance she got." On redirect examination, Hallmon testified that the victim's drug use was the victim's only problem and that the victim "was great with the kids and everybody else."

Kevin Williams testified that on May 31, 2013, he was living in Frayser at 597 Burlington Circle, which was one unit of a two-unit duplex. The unit had a front door and a side door. The victim and "a little friend, a boyfriend" lived at 599 Burlington Circle, which was the other half of the duplex, and the Appellant lived in a house across the street. That evening after Williams got off work, the Appellant came over to Williams's home. Williams stated, "We just chill. Do what we always do. Just kick it." The victim was at the home of a neighbor, Steve. At some point, the Appellant "went over there and got [the victim]" from Steve's residence and brought her to Williams's residence. Williams said that the victim had a black bag with her and that the bag contained "her belongings and I don't know what all was in there."

Williams testified that the three of them were in the living room "just chillin'" and that he was smoking marijuana while the Appellant was drinking a beer. He said that the victim bent over to get something out of the black bag and that the Appellant walked up to her. The Appellant grabbed the back of the victim's head and told her that he wanted her to "'give [him] some of that head,'" meaning oral sex. The victim refused. Williams said that the victim "went back in the bag to get something" and that the Appellant "walked up on her and did the same thing again." The victim refused again, and Williams told the Appellant to leave the victim alone. The victim went into the bag a third time, and the Appellant did the same thing to the victim. The victim told the Appellant, "'I'm going to knock your bitch ass out.'" She hit him, and the Appellant stumbled backward.

Williams testified that the Appellant grabbed his nose and that the victim was "still talking shit, 'Yeah, bitch, what you think I told you, whoo, whoo, whoo, whoo.'" The Appellant saw he was bleeding and told the victim, "'Bitch, you made me bleed.'" The victim told the Appellant, "'I told your bitch ass.'" Williams said that the Appellant reached into his back pocket and that the victim was "still going off on" the Appellant. The Appellant pulled out a handgun and "pointed it up." The Appellant, who was standing in front of Williams, looked back at Williams and asked him, "'Hey, Cous, you think I should shoot this bitch?'" Williams told the Appellant, "'Hell, no, fool, she told you to quit messing with her.'" The Appellant turned around and told the victim, "'Bitch, I feel sorry for your kids.'" He then "started shooting." The Appellant fired five or six shots, and the victim said, "'Oww, oww, oww, oww.'"

Williams testified that the Appellant told the victim, "'Bitch, you better not bleed on my [n***er's] floor.'" The Appellant took the victim "through the kitchen" to the side door, and the victim asked the Appellant, "'Why you do this to me? Why you do that? You hurt me. You didn't even have to shoot me.'" Williams said that the victim was conscious but that her voice was "going down and down and down . . . like she was just out of it." Williams saw "little red spots" and knew the victim was bleeding. He said that the Appellant took the victim out the door, that the Appellant came "right back" inside without her, and that the Appellant had blood on his face, shirt, and arm.

Williams testified that the Appellant was "raging." Williams did not know what the Appellant was going to do, so he left through the front door. Williams explained, "I was scared. I was scared. He just shoot the girl. The girl is about one hundred pounds soaking wet, man. He just shoot her so look at me. I'm one seventy five, two hundred. I know [he] would have shot me." Williams did not return to his home that night. The next day, he spoke with the police and told them about the shooting. The police showed him a six-photograph array, and he identified the Appellant in the array as the shooter. The State asked if Williams knew how much alcohol the Appellant consumed before the shooting, and Williams answered, "[W]hen I got out of work we had some beers, you know what I am saying? From 40 on up."

On cross-examination, Williams acknowledged that he gave a statement to the police the day after the shooting and that he did not say anything in his statement about the Appellant's trying to get oral sex from the victim. He said that he was scared and "still shocked" when he gave his statement and that he later told the prosecutors about it. He also did not say in his statement that the Appellant turned to him and asked if the Appellant should shoot the victim. Williams said, "I swear to God I told [that to the police]." According to Williams's statement, the police asked if he knew why the victim and the Appellant were arguing before the shooting, and Williams told the police no. He acknowledged that he was smoking marijuana on the night of the shooting and said that he smoked marijuana every day "back then." The victim also was smoking marijuana

that night, but Williams never saw her use any other drugs. Williams said that he did not have anything to hide and that he told "the whole truth today."

Steve Eddlemon testified that in May and June 2013, he lived in a duplex on Burlington Circle. Kevin Williams "[l]ived in the next set of duplexes," and their kitchen doors faced each other. The victim began staying with Eddlemon about twenty-four hours before the shooting, but they never had sex. Eddlemon said that on the night of May 31, 2013, he and the victim were using drugs, including methamphetamine. About 12:30 a.m., the Appellant knocked on Eddlemon's door and wanted to speak with the victim. The victim left with the Appellant and took a plastic bag with her. Before she left, Eddlemon asked the victim to show him what was in the bag, but she refused.

Eddlemon testified that about one hour later, he heard screaming and looked out his kitchen window. The victim and the Appellant were standing on the ground in front of Williams's kitchen door and were "hollering back and forth." Williams was standing "up in his house." Eddlemon said Williams appeared to get "tired of it," went inside, and slammed the door. Eddlemon stopped looking out his window.

Eddlemon testified that about 3:30 a.m., he heard someone banging on his kitchen door. He answered the door and saw the Appellant. The Appellant was not wearing the white t-shirt he had been wearing earlier and was "dressed up." Eddlemon invited the Appellant inside and asked about the victim. The Appellant told Eddlemon that the victim "took off in some kind of blue or black car" and that he was going to take a trip "up north," which Eddlemon thought was "kinda strange." The Appellant stayed ten or fifteen minutes and left. About 6:00 a.m., Eddlemon went outside and found the victim lying face-down on the ground. She was deceased, and Eddlemon called 911. He later gave a statement to the police and viewed a photograph array of suspects. Eddlemon selected the Appellant's photograph from the array.

Officer Shawn Biessenberger of the Memphis Police Department (MPD) testified that he was dispatched to Burlington Circle about 6:10 a.m. on June 1, 2013. He spoke with Steve Eddlemon and saw the victim lying behind a duplex. She appeared to be deceased. Officer Biessenberger called paramedics to the scene and secured the area. When the paramedics arrived, they pronounced the victim dead.

Officer William Kaiser of the MPD testified that on June 1, 2013, he responded to a call on Burlington Circle and went across the street with Sergeant Kevin Lundy to speak with "some people." Sergeant Lundy talked with the Appellant, and Officer Kaiser put the Appellant into a patrol car and transported him to the police department for questioning. Officer Kaiser said that he conversed with the Appellant during the drive and that the Appellant's speech was normal. The Appellant did not appear to be under the influence of drugs or alcohol and was calm.

Officer Stacy Milligan of the MPD testified that on the morning of June 1, 2013, he responded to the scene on Burlington Circle and photographed the victim's body. He said that from the way the victim's feet were positioned, it looked like the victim "may have been dragged to that spot." A bullet casing was "just feet" from the side door of Kevin Williams's residence, and a trail of evidence led from the door to the victim. The trail of evidence included a pair of women's sunglasses, a bloody t-shirt, and a necklace or bracelet. "[F]oot tracks" appeared to go from the body back to the duplex. Blood and scuff marks made by the victim or the suspect were on the ground, and scuff marks were "coming back from the body." Officer Milligan went inside Williams's residence and photographed bullet holes in a wall adjacent to the kitchen. A white towel in the bathroom sink appeared to have blood on it, and a "live" twenty-two caliber bullet was on top of a dresser.

Officer Milligan testified that the police executed a search warrant on the Appellant's home and found the contents of a woman's purse on the bedroom floor. They also found clothing on the floor, including a pair of blue jeans with stains on the knees; a white towel that appeared to have blood on it; a condom wrapper; and two, twenty-two-caliber bullet casings on either side of the wrapper. They found an empty twenty-two-caliber bullet holder in a dresser drawer but never found a firearm. Officer Milligan went to an abandoned home on Orchard Avenue that was within walking distance of the Appellant's house. There, police officers found a black plastic bag outside the house. Upon opening the bag, they saw "a bullet casing sitting just like it was once you peel that bag back." They also found photographs of "some young ladies" in the bag. The hair color of one of the women was "distinctively red" and resembled the victim's hair color.

On cross-examination, Officer Milligan testified that numerous other items were in the plastic bag, including books, shoes, makeup, a Thom Thom GPS, cellular telephones, and a traffic ticket. Officer Milligan acknowledged that he did not know how the bag got there.

Lindsey Price, a death investigator for the West Tennessee Regional Forensic Center, testified that on June 1, 2013, she went to a residence on Burlington Circle. The victim was lying face-down in the back yard. She was fully clothed and had mud on her clothes. A chain-link fence was near the victim, and the fingers on the victim's left hand were "kind of hooked onto the fence" as if she were holding onto it. Price unhooked the victim's fingers and noticed an abrasion on her middle finger. Price rolled the victim over, began examining the body, and found two bags of what she believed to be drugs in the victim's bra. Price noticed "a lot" of abrasions on the victim.

Marco Ross, the Chief Medical Examiner for West Tennessee Regional Forensic Center, testified as an expert in forensic pathology that he conducted the victim's autopsy. The victim had five gunshot entrance wounds: one on her left cheek, one on

her upper chest, one on her right shoulder, and two on the left side of her back. He could not determine the order in which the gunshots were fired, and he did not find any soot or stippling around the entrance wound on the victim's face, meaning that the muzzle of the gun was probably more than three to four feet from the victim when the gun was fired. He also did not find any soot or stippling around the other four entrance wounds. Those wounds were covered by clothing, though, so he was unable to determine the distance between the muzzle of the gun and the victim when the gun was fired.

Dr. Ross testified that the bullet that entered the victim's chest traveled front to back, slightly downward, and through her right lung. He acknowledged that the path of the bullet was consistent with the Appellant and the victim standing and facing each other and the Appellant's being taller than the victim. The victim's gunshot wound to the chest was fatal. Dr. Ross said that the bullets that entered the victim's back traveled back to front and through her left lung. Dr. Ross saw no "appreciable" upward or downward movement of the bullets, and he acknowledged that the paths of the bullets were consistent with the victim lying down and the Appellant standing over her. The gunshots to the victim's back also were fatal. Dr. Ross said the victim's death would not have been instantaneous. Although she could have lived for an hour after the shooting, she most likely lived less than fifteen minutes. Dr. Ross recovered five bullets from the victim and observed "a number of other abrasions and contusions scattered about her body."

Dr. Ross testified that the victim was five feet, two inches tall and weighed one hundred twenty-seven pounds. Toxicology tests showed the following drugs in her blood: amphetamine; methamphetamine; 7-aminoclonazepam, a breakdown product of Klonapin; alprazolam, also known as Xanax; cocaine; and benzoylecgonine, a breakdown product of cocaine. He said that the level of 7-aminoclonazepam in the victim's blood indicated that she ingested the drug one or two days before her death. The levels of the remaining drugs suggested that she ingested them "within about a twenty-four-hour timeframe before death." He said that he did not know whether the victim was a habitual drug user and that the drugs' effects on the victim would have depended on her tolerance to them.

On cross-examination, Dr. Ross acknowledged that the victim's gunshot wounds, not drug use, caused her death. Nevertheless, the level of methamphetamine in her blood was seven hundred nanograms per milliliter, which was high "even in users of the drug." He said that he thought the level of methamphetamine in therapeutic users was only ten to twenty-five nanograms per milliliter and that "some individuals at [the victim's] level certainly can exhibit agitation, aggressiveness, anxiety, paranoia, and hallucination." Dr. Ross acknowledged that the abrasions and contusions on the victim's body were consistent with a fight. With regard to the four entrance wounds covered by clothing, Dr. Ross explained that the muzzle of the gun could have been closer than three to four feet

when the gun was fired "because the clothing would prevent me from seeing soot or stippling on the skin."

Cervinia Braswell, a special agent forensic scientist with the Tennessee Bureau of Investigation (TBI), testified as an expert in firearms identification that she examined the following evidence in this case: four, twenty-two-caliber bullet casings; one, twenty-two-caliber cartridge, unfired; and the five bullets recovered from the victim. She did not receive a gun. The four cartridge cases shared the same class characteristics, but Agent Braswell could not say they were fired from the same firearm without being able to shoot "test fires" from that firearm. However, all of the bullet casings could have been fired from a twenty-two-caliber pistol. Agent Braswell was able to determine that four out of the five bullets recovered from the victim were fired from the same gun. The fifth bullet was too damaged for her to make a determination. On cross-examination, Agent Braswell acknowledged that she could not determine if any of the four bullets recovered from the victim came from any of the four bullet casings.

Kristyn Meyers, a special agent forensic scientist with the TBI, testified as an expert in forensic biology that she tested evidence collected in this case for the presence of blood and compared the DNA profiles of the blood to the DNA profiles of the victim and the Appellant. Blood was on the t-shirt found outside Kevin Williams's home and the white towel found inside the Appellant's home. The blood on the t-shirt was that of the victim and the Appellant, and the blood on the towel was that of the Appellant. Agent Meyers tested swabs collected from the doorstep of Williams's home and yard and found the victim's blood on the swabs. On cross-examination, Agent Meyers acknowledged that both the victim and the Appellant were bleeding and that she had no way to determine who was the primary aggressor.

Kevin Lundy testified that in June 2013, he was a sergeant with the MPD's Homicide Bureau and was assigned to investigate the victim's death. On June 1, he went to Burlington Circle and viewed the victim's body. Witnesses reported that "Ant" was possibly involved, so Sergeant Lundy walked to a home across the street and spoke with the Appellant. The Appellant wanted to know what was going on, and Sergeant Lundy did not notice anything unusual about his gait, demeanor, or speech. Sergeant Lundy had an officer transport the Appellant to the police department.

Sergeant Lundy testified that he talked with Kevin Williams. Williams was "very upset, very shocked," and his demeanor was "[d]rastically different" from the Appellant's demeanor. Sergeant Lundy then interviewed the Appellant. The Appellant waived his Miranda rights and gave a written statement in which he said the following: The Appellant and the victim went to Williams's residence, and the victim "got upset 'cause I wouldn't give her what she was looking for, or whatever." The victim "swung" at the Appellant twice. The first time, she missed hitting him. The second time, though, she hit his nose. The Appellant had a gun in his pocket. He pulled out the gun and shot the

victim two times. They continued to argue, and the victim was still trying to fight. The victim and the Appellant went behind Williams's home, and the Appellant shot the victim again. They were "tussling on the ground," and the Appellant was on top of her. He got off the victim and left with his cousin. Sergeant Lundy asked the Appellant, "What did you mean when you said you wouldn't give [the victim] what she was looking for?" The Appellant answered, "She want[ed] some drugs." The Appellant told the officer that he remembered firing four shots. Sergeant Lundy asked what the Appellant did with the gun, and the Appellant said he "put the gun in the garbage can in the bathroom wrapped in a white towel." Sergeant Lundy obtained a search warrant for the Appellant's home but never found the weapon.

On cross-examination, Sergeant Lundy acknowledged that according to the Appellant, the victim was the first aggressor. Sergeant Lundy also acknowledged that he took a statement from Kevin Williams. Williams told Sergeant Lundy that the Appellant and the victim were arguing before the shooting but that he did not know what they were arguing about. If Williams had told Sergeant Lundy that they were arguing about oral sex, Sergeant Lundy would have included that in Williams's statement. On redirect examination, Sergeant Lundy testified that Williams was crying and shaking when he gave his statement. Sergeant Lundy acknowledged that it would not have been unusual for someone in that "mindset" to forget to tell him important details. At the conclusion of Sergeant Lundy's testimony, the State rested its case.

Lady Jordan testified that in May and June 2013, she lived in a duplex at 593 Burlington Circle and that "Angel" and "Dale" lived with her. "Steve" lived in the unit "[r]ight next door," and their units were separated by a wall. Regarding the night of May 31, she stated as follows:

> Next door, there was a party, or a gather, or whatever, a whole lot of screaming and hollering, and partying and laughing, slamming and carrying on, probably most of the evening and the night. I had a job with some elderly folks, and from the time I had come home, around about five, it had been going on already, and continued through most of the night.

She said that she heard Steve, Dale, Angel, the victim, "Kevo," and "the drug dealer who drives the gold car" at the party and that they were "in and out, and back and forth, and in the back yard, in the front yard, in the side yard." Jordan stayed in her back bedroom but "peeked" outside occasionally.

Jordan said that about ten minutes after Saturday Night Live went off television, she heard a commotion and looked out her window. She saw a couple of people standing near Steve's side of the duplex and saw the Appellant "stumble back to his mother's

house across the street. He tripped over the curb, stumbled over to his house and went up the front steps." About one hour later, Jordan was awakened by "a bang." She then heard four more bangs. She looked out her window and saw Dale, Angel, Steve, Kevo, and the drug dealer running. She said she thought "it was just Kevo showing off his gun collection again" and went back to sleep. Later that night, Dale woke her and told her that a dead body was in the back yard. Jordan went outside and saw Kevo "throwing things into the trunk of the car . . . getting ready to leave." The next morning, Jordan tried to tell a police officer what she had seen. However, the officer told her that because she did not witness the actual shooting, she needed to "mind [her] own business" or he was going to arrest her for interfering.

Jordan testified that prior to May 31, she had met the victim "in passing" but did not know her personally. The victim did not have a place to live and often slept on a futon in the back yard. Jordan said she knew the Appellant as "Ant" and that she had seen him "down the corner." Defense counsel asked that Jordan look at the Appellant in the courtroom and asked if she noticed "any difference in the way his nose is configured on his face." She answered,

> Yeah. It's messed up. . . . I don't know if he fell down --
> when he fell down and hit the curb, whether he might have
> hurt himself, or beforehand, . . . but it looks like somebody
> punched him in the nose, and he didn't get his nose fixed,
> that's for sure, or straightened out, anyway.

On cross-examination, Jordan testified that a couple of days after the shooting, she learned the Appellant had been arrested. She acknowledged that she never told the police what she witnessed on May 31.

The trial court asked Jordan what she meant when she said she saw the Appellant "stumble," and she answered, "He had been drinking all night long, so he was stumbling across the road, and I remembered it because I was laughing at him when he fell down, or fell over the curb." The court asked if the Appellant fell "[f]ace first," and Jordan said he fell "[f]orward." She said that she did not know if he hit his face on the curb but that "I did see him hit the sidewalk." She acknowledged that she did not know what happened to the Appellant's nose.

The jury convicted the Appellant as charged of first degree premeditated murder. The trial court immediately sentenced him to life.

## II. Analysis

### A. Self-Defense Instruction

- 9 -

The Appellant contends that the trial court erred by refusing to instruct the jury on self-defense because the proof showed that the victim was under the influence of extremely high levels of methamphetamine, was the first aggressor, and violently attacked him. The State argues that trial court properly refused to give the instruction. We conclude that the trial court erred by failing to instruct the jury on self-defense and that the State failed to show the error was harmless.

Before trial, the Appellant filed a written request for a jury instruction on self-defense, claiming that the evidence would show the victim was under the influence of extremely high levels of cocaine and methamphetamine and was the first aggressor. During the State's proof, Kevin Williams testified that the victim hit the Appellant's nose before the Appellant pulled out his gun and shot her. Sergeant Lundy testified about the Appellant's statement, and the State introduced the statement into evidence. In the statement, the Appellant said:

> I was at Steve's house, and him and Amy were arguing. Me and Amy, she got her stuff, and we left and went over to Kevo's house. Then we chill for a minute and she got upset cause I wouldn't give her what she was looking for or whatever. So we got into an argument and she swung and tried to hit me the first time and she didn't hit me. Then she swung a second time and she hit me in the nose. I had the gun in my hand and I pulled it out from my pocket and I pulled the trigger and shot her. I think I shot her twice. We were still arguing, she was still trying to fight over there so we went behind the house still arguing. I shot her again when we were tussling on the ground and I was on top of her. I left and walked on Thomas and got in a car with my cousin.

At the close of the State's proof, the trial court noted that in order to use deadly force against the victim, the Appellant had to have a reasonable belief of death or serious bodily injury caused by the victim. The trial court found that even if the Appellant's statement to Sergeant Lundy were true in that the victim punched the Appellant in the nose, hitting someone's nose did not qualify as "serious bodily injury."[1] The court concluded that because nothing in the record showed that the victim used or attempted to use deadly force against the Appellant or that she caused or threatened to cause serious bodily injury, the issue of self-defense had not been fairly raised by the proof.

---

[1] "Serious bodily injury" is defined as a bodily injury that involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or (F) A broken bone of a child who is eight (8) years of age or less. Tenn. Code Ann. § 39-11-106(a)(34).

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Therefore, a trial court must instruct the jury on the rules of law applicable to the issues that are fairly raised by the evidence adduced at trial. State v. Townes, 56 S.W.3d 30, 36 (Tenn. Crim. App. 2000). Conversely, there is no duty to charge the jury on an issue not fairly raised by the evidence. Id. "To determine whether [self-defense] has been fairly raised by the proof, a court must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor." State v. Hawkins, 406 S.W.3d 121, 129 (Tenn. 2013). If the defense has been fairly raised by the evidence, the burden shifts to the State to prove that the defense does not apply beyond a reasonable doubt. Regardless, if the entire charge fully communicates the applicable law, the trial court does not err in denying an instruction inapplicable to the case at hand. State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001).

In this state,

> [A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> > (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
> >
> > (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
> >
> > (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(2)(A)-(C). The belief must "meet an objective standard of reasonableness to be justified," and "the mere fact that the defendant believes that his conduct is justified would not suffice to justify his conduct." State v. Bult, 989 S.W.3d 730, 732 (Tenn. Crim. App. 1998). Whether a defendant acted in self-defense is a factual question to be determined by a jury, and it is within the jury's prerogative to reject a claim of self-defense. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997).

On appeal, the State argues that the trial court's ruling was correct because the Appellant could not have had a reasonable belief that he was in danger of death or serious bodily injury. In support of its argument, the State notes that the victim was unarmed, that she hit the Appellant in the nose only one time, that a broken nose did not constitute

"serious bodily injury," that Williams described the victim as "skinny and small," and that the Appellant asked Williams if he should shoot the victim before he fired the gunshots. However, the State's argument is flawed.

As our supreme court has explained, "'The jury determines not only whether a confrontation has occurred, but also which person was the aggressor. It also decides whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault.'" State v. Pruitt, 510 S.W.3d 398, 420 (Tenn. 2016) (quoting State v. Renner, 912 S.W.2d 701, 704 (Tenn. 1995)). "Thus, a defendant may expect only that the jury be properly instructed regarding the law of self-defense . . . , thereby enabling the jury to correctly apply the law to the facts as it finds them." Renner, 912 S.W.2d 704. In other words, when the issue of self-defense has been fairly raised by the evidence, it is up to the jury, not the trial court, to determine whether the defendant's belief in imminent danger or the amount of force used by the defendant were reasonable. Self-defense was fairly raised by the proof in this case. Therefore, the trial court erred by failing to instruct the jury on the defense.

A trial court's failure to provide a self-defense instruction when required is a nonstructural constitutional error. See State v. Brown, 311 S.W.3d 422, 434 (Tenn. 2010) (stating that failure to instruct the jury as to a lesser-included offense is a nonstructural constitutional error). As such, the Appellant is "entitled to a new trial unless we are convinced beyond a reasonable doubt, and on the basis of the entire record, that this error did not contribute to the jury's verdicts." State v. Bell, 512 S.W.3d 167, 192 (Tenn. 2015). When determining whether the error was harmless beyond a reasonable doubt, we "'should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury.'" State v. Banks, 271 S.W.3d 90, 126 (Tenn. 2008) (quoting State v. Allen, 69 S.W.3d 181, 191 (Tenn. 2002)). The burden is on the State to show that a nonstructural constitutional error is harmless. Brown, 311 S.W.3d at 434.

Turning to the instant case, the Appellant's main defense theory was that of self-defense, which "is a complete defense to crimes of violence." State v. Ivy, 868 S.W.2d 724, 727 (Tenn. 1993). Defense counsel raised the issue of self-defense in his opening statement, saying that the victim "was the perpetrator of a violent attack against Antonio, making him react, making him defend himself." During the trial, the proof was uncontroverted that the victim hit the Appellant in the nose before he shot her. Even the prosecutor appeared to recognize that self-defense had been fairly raised by the evidence, warning the jury during his closing argument that the jury could not consider self-defense because

> this is not a self-defense case. If it were a self-defense case, you'd have an instruction on that because, as we told you previously, as the Court has told you, the Judge can't

- 12 -

comment on the evidence, but he, by law, has to give you everything possibly raised in the proof.

Defense counsel, unable to argue the complete defense of "self-defense" in his closing, instead argued that Appellant did not commit first degree premeditated murder. However, the jury convicted the Appellant of the offense as charged.

Moreover, during jury deliberations, the jury sent out a written note, asking, "Is it ever okay to shoot someone in the back in any situation? Rather it's self-defense, someone breaking in your house, etc." The trial court advised the parties that it was going to inform the jury that the jury could not consider self-defense. Before the trial court could bring the jury back into the courtroom, though, the jury notified the trial court that it had reached a verdict. The jury's question, despite the trial court's not giving an instruction on self-defense and the State's advising the jury that it could not consider self-defense, is perplexing. In addition, the trial court's failure to give the jury a self-defense instruction lowered the State's burden of proof because "it removed the requirement that the state prove beyond a reasonable doubt that the defendant did not act in self-defense." State v. Morgan Johnson, No. W2003-02349-CCA-R3-CD, 2004 WL 2237988, at *9 (Tenn. Crim. App. at Jackson, Oct. 1, 2004). Therefore, we are compelled to reverse the Appellant's conviction and remand the case for a new trial.

Although we have determined that the Appellant's conviction must be reversed, given the possibility of further appellate review, we will briefly address his remaining issues.

B. Victim's Prior Violence

Next, the Appellant contends that the trial court erred by ruling that he could not question Kevin Williams about a fight that occurred between the victim and her cousin. The Appellant claims that the evidence was admissible to show that the victim was the first aggressor before the shooting and that he reasonably feared her. The State argues that the trial court properly ruled that the evidence was inadmissible because the proof had established that the victim was the first aggressor and because the victim's "minor squabble with her cousin" was not violent. We agree with the State that the trial court properly excluded the evidence.

On direct examination, Williams testified that the victim hit the Appellant before the shooting. During Williams's cross-examination testimony, defense counsel asked, "The day before or several days before [the shooting], do you recall the fight between [the victim] and [an individual named Brittany]?" The State objected on the basis of relevance, and the trial court sustained the objection. Defense counsel requested that the parties approach the bench. During the bench conference, defense counsel advised the

- 13 -

trial court that the Appellant was present during the fight and that the fight was relevant to show the Appellant was aware of the victim's "violent tendencies."

The trial court held a jury-out hearing, and defense counsel asked Williams if he witnessed a fight between the victim and her cousin. Williams answered, "Yes, I did." Williams said that the incident occurred "a couple of days or a week" before the Appellant shot the victim and that he and the Appellant were present. Defense counsel asked if the victim "attack[ed]" her cousin, and Williams answered, "I can't remember. I don't know." Defense counsel asked if "they were fighting each other," and Williams answered, "Yeah." Defense counsel asked if the victim hit her cousin "as hard as she could," and Williams answered, "I don't know. I -- no, sir." Williams said that the victim's cousin was not bleeding, that the incident "didn't last that long because me and Ant had broke it up," and that he did not know what the altercation was about. On cross-examination, Williams acknowledged that the incident involved "[j]ust hands on hands" and "scuffling." He described the incident as "a quick little fight" and said the two women "were fine after that."

At the conclusion of the hearing, defense counsel argued that Williams's testimony was relevant to show the Appellant's knowledge of the victim's prior violence and to show that she could have been the first aggressor in this case. The trial court ruled that although the State had presented proof that the victim hit the Appellant before the shooting, the issue of self-defense had not yet been raised by the evidence. The court then ruled that, in any event, Williams's testimony did not establish that the victim's altercation with her cousin was violent or that the victim had engaged in prior acts of violence against a third person. The trial court concluded that the proffered evidence was inadmissible character evidence and that the probative value of the evidence was significantly outweighed by the danger of unfair prejudice.

Generally, "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this [c]ourt will not interfere in the absence of abuse appearing on the face of the record." State v. Plyant, 263 S.W.3d 854, 870 (Tenn. 2008). A trial court abuses its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Id.

This court has previously stated that "[t]here is a distinction between evidence of prior acts of violence by the victim used to corroborate the defense theory that the victim was the first aggressor and that used to establish the defendant's fear of the victim." State v. Ruane, 912 S.W.2d 766, 779 (Tenn. Crim. App. 1995). When a defendant's fear of the victim is relevant and the defendant is aware of the prior acts, the defendant can testify about his knowledge of the victim's violent conduct. State v. Hill, 885 S.W.2d 357, 361 n.1 (Tenn. Crim. App. 1994) (citing Williams v. State, 565 S.W.2d 503, 505 (Tenn. 1978)). In the instant case, the Appellant did not testify but sought to introduce

- 14 -

evidence about his fear of the victim through Williams. Regardless, nothing in Williams's jury-out testimony suggested that the Appellant's witnessing the victim's altercation with her cousin caused the Appellant to fear the victim on the night of the shooting. Williams did not say that the victim was the first aggressor in the altercation with her cousin, that she harmed her cousin, or that the Appellant expressed fear of the victim after the altercation. Therefore, we conclude that the trial court properly excluded the evidence.

This court has explained that before the defense may introduce evidence of a victim's prior acts of violence in order to corroborate the defendant's claim that the victim was the first aggressor, "the evidence must establish an issue which makes such evidence relevant, and, therefore, admissible." State v. Robinson, 971 S.W.2d 30, 40 (Tenn. Crim. App. 1997). Further, before proof of first aggression may be admitted, the following conditions must be satisfied:

> 1. Self-defense must be raised by the proof and not by the words and statements of counsel.
>
> 2. The trial judge must determine whether or not there is a factual basis underlying the allegations of tendencies of first aggression.
>
> 3. The trial judge must determine whether or not the probative value of the evidence is outweighed by the potential for unfair prejudice.

See Ruane, 912 S.W.2d at 781.

Here, Williams had testified on direct examination that the victim hit the Appellant in the nose before the shooting. Therefore, we disagree with the trial court's conclusion that the proof had not yet raised self-defense. That said, the trial court held that there was no factual basis underlying the allegation that the victim had a tendency for first aggression. We agree. Williams provided very little information about the victim's fight with her cousin. He could not say what precipitated the fight, and he did not say that the victim was the first aggressor. Therefore, the evidence did not corroborate the Appellant's claim that the victim was the first aggressor before the shooting and had no probative value. Accordingly, we again conclude that the trial court properly excluded the evidence.

## C. Appellant at Counsel Table

The Appellant contends that the trial court erred by denying his request to sit at counsel table because "there was room for at least one more chair" at the table. He

claims that sitting at counsel table would have allowed more appropriate access to his lawyer, would not have placed him in closer proximity to court personnel, and would have prevented "a prejudicial stigma of 'dangerous' defendant." The State argues that the trial court gave valid reasons on the record to support its denial of the Appellant's request and, therefore, properly exercised its discretion. We agree with the State.

Prior to jury selection, defense counsel requested that "another chair be brought and have Antonio sit at the table with me from the beginning of the trial until the end." The trial court stated as follows:

> The local Rules of Criminal Procedure, Rule 805, would indicate the local rules that we've adopted in the 30th Judicial District would indicate that counsel table [is] preserved for lawyers. Not making a finding that Mr. Benson can't sit at counsel table because he's not an attorney, but we have, and I've put this on the record multiple times and will continue to say this, I wish the Court of Criminal Appeals and the Supreme Court would take a visit to the criminal courts in Shelby County, Tennessee, because these criminal courts are unlike any other venue not only in the state but in the country. Probably in the world. These courtrooms are very small. They lend themselves to incidents that have happened in the courtroom amongst lawyers and defendants and sometimes prosecutors. And it's just not in the best interest of justice and it's just not, frankly, something that is safe and secure to have a person charged with a serious crime sitting at counsel table just a few feet from the prosecuting attorneys.

> . . . .

> And I will err on the side of -- err on the side of caution and err on the side of making sure that there's not an interruption in the administration of justice. And I have never allowed a defendant to sit at counsel table. Mr. Benson is seated probably two or three feet behind trial lawyers. Mr. Benson literally could reach out and touch his lawyers if he felt a need to do so.

> And for those reasons, because of the size of this courtroom and because of other security issues, this Court in its considered discretion, pursuant to [State v. Rice, 184 S.W.3d 646 (Tenn. 2006)], and it is then the discretion of the trial court, will allow and will continue to follow the local

- 16 -

Rules of Criminal Procedure that have been adopted and proved by these courts. The courts have indicated that it is a better practice to allow the defendant to sit at counsel table, but it is within the discretion of the trial court.

In Rice, our supreme court determined that "[w]hile it is the better practice to allow a defendant to sit at counsel table," the trial court's refusal to allow a defendant to sit there "did not impair the defendant's presumption of innocence" and did not "impact the defendant's ability to communicate with his counsel." 184 S.W.3dd at 674. More recently in State v. Smith, 492 S.W.3d 224, 243 (Tenn. 2016), our supreme court found that a trial court abused its discretion by denying a defendant's request to sit at counsel table when the sole reason given for the denial was that the defendant was not an attorney. As the supreme court explained,

> the fact that the Defendant is not an attorney is immaterial to the question of whether he should be permitted to sit at counsel table. Additionally, the trial court's reasoning directly conflicts with this Court's statement in Rice that "it is the better practice to allow a defendant to sit at counsel table." 184 S.W.3d at 675. The instances are rare when the trial court should not allow the defendant to sit at counsel table, although "the course and conduct of trial proceedings rests within the sound discretion of the trial court." State v. King, 40 S.W.3d 442, 449 (Tenn. 2001) (citing State v. Cazes, 875 S.W.2d 253, 260 (Tenn. 1994)). The trial court did not make any findings on the record of any additional reasons why the Defendant should not have been allowed to sit at counsel table. Accordingly, we hold that the trial court erred in denying the Defendant's request to sit at counsel table. See [State v. Davis, 466 S.W.3d 49, 61 (Tenn. 2015)].

Smith, 492 S.W.3d at 243-44.

Turning to the instant case, the Appellant contends that "while the [courtroom] is not huge, there is room for at least three people on the Defendant's side of counsel table." However, during oral arguments, defense counsel advised this court that in Shelby County courtrooms, the prosecutors and defense counsel routinely sit at the same counsel table and that he had never noticed the State's prosecuting witness sitting at counsel table with the prosecutors. The trial court explained that it was denying the Appellant's request to sit at counsel table because the size of the courtroom would put the Appellant, charged with a serious crime, within close proximity to the prosecutors, which the trial court considered a security issue. Unlike Smith, the trial court in this case gave a logical reason for denying the Appellant's request to sit at counsel table.

- 17 -

In any event, when defense counsel made the request in this case, he did not allege that the Appellant needed to sit with him in order to assist with the trial. On appeal, the Appellant likewise does not contend that his sitting behind counsel affected his ability to consult with counsel. He does argue, though, that his sitting behind counsel "gives the possible perception to the jury of inequality or danger," thus creating prejudice. However, as our supreme court has stated, such a "seating arrangement" does not impair a defendant's presumption of innocence. Smith, 492 S.W.3d at 244 (citing Rice, 184 S.W.3d at 675)). Moreover, the Appellant's claim that the seating arrangement leads a jury to perceive inequality or danger is speculative. Thus, the Appellant has failed to demonstrate prejudice, so any error would be harmless. Tenn. R. App. P. 36(b); see id.

## D. Sufficiency of the Evidence

Finally, the Appellant claims that the evidence is insufficient to support the conviction because the State failed to show that his actions were "'sufficiently free from excitement and passion.'" In other words, the Appellant contends that the State failed to show premeditation. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" Rice, 184 S.W.3d at 662 (quoting Marable v. State, 313 S.W.2d

451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). A person "acts intentionally with respect to . . . a result of the conduct when it is the person's conscious objective or desire to . . . cause the result." Tenn. Code Ann. § 39-11-302(a). Tennessee Code Annotated section 39-13-202(d) defines "premeditation" as "an act done after the exercise of reflection and judgment."

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

The element of premeditation is a question of fact for the jury. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003).

Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. Bland, 958 S.W.2d at 660. In State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000), our supreme court delineated the following circumstances from which a jury may infer premeditation:

> [D]eclarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

The jury may also infer premeditation from the establishment of a motive for the killing and the use of multiple weapons in succession. State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

The Appellant acknowledges that he shot and killed the victim but contends that his actions were in direct response to a "passionate and exciting encounter" with the victim, who was high on methamphetamine. In support of his claim, the Appellant

- 19 -

contends that the evidence shows no procurement of a weapon and no evidence of a motive other than the "passionate interchange" between them.

Taken in the light most favorable to the State, the evidence shows that the victim was trying to get something out of her bag and that the Appellant kept pestering her for oral sex. The victim kept refusing him and finally punched him in the nose. Angry, the Appellant pulled a gun from his pants and pointed it at the victim. Although the firearm had been in his pants the duration of the night, he did not display it and point it at the victim until she hit him. The Appellant then looked back at Kevin Williams and asked if he should shoot the victim. Despite Williams's telling the Appellant no, the Appellant called the victim a "bitch," told her that he felt sorry for her children, and shot her multiple times. He then dragged her into the back yard, shot her twice in the back, and abandoned her there while she was still alive. He disposed of the weapon and the victim's black bag, went home, and changed clothes.

The Appellant's anger was his motive. He used a weapon on the unarmed victim, inflicted multiple wounds on the victim, and hid evidence of the killing. Moreover, his telling the victim that he felt sorry for her children immediately before the shooting could have been construed as a declaration to kill her, and his abandoning the conscious but mortally-wounded victim in the yard was particularly cruel. In sum, the State presented numerous circumstances from which the jury could infer premeditation. Accordingly, the evidence is sufficient to support the conviction.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we conclude that the trial court erred by refusing to instruct the jury on self-defense and that the State failed to show the error was harmless beyond a reasonable doubt. Therefore, we are compelled to reverse the Appellant's conviction and remand the case to the trial court for a new trial.

_____
NORMA MCGEE OGLE, JUDGE